2008 WY 144

**Floyd Dewayne GRADY, Appellant (Defendant),**

**v.**

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 06–287.

Supreme Court of Wyoming.

Dec. 10, 2008.

Representing Appellant: Diane M. Lozano, Wyoming State Public Defender; Tina N. Kerin, Appellate Counsel; David Westling, Senior Assistant Appellate Counsel; Kirk A. Morgan, Assistant Appellate Counsel. Argument by Ms. Kerin.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Leda M. Pojman, Assistant Attorney General. Argument by Ms. Pojman.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.

GOLDEN, Justice.

[¶1]   A jury convicted Appellant Floyd Wayne Grady of attempted first degree sexual assault and first degree murder, for which he was sentenced to consecutive terms of imprisonment of forty to fifty years and life without the possibility of parole.  On appeal, Grady raises issues concerning the exclusion of alternate suspect evidence, the denial of a continuance, lost evidence, and prosecutorial misconduct.  We affirm.

## ISSUES

[¶ 2]   Grady presents these issues for our review:

I.  Did the trial court commit reversible, constitutional error when it kept out evidence of alternate suspects in the death of Ms. Watts and subsequently denied a motion for new trial based on those evidentiary rulings?

II.  Did the trial court err when it denied Appellant's motion for continuance, which was based upon the late provision of discovery pertaining to a potential alternate suspect in Ms. Watts' death?

III.  Did reversible error occur when a potentially exculpatory note was "lost" by the State?

IV.  Did the prosecutors commit prosecutorial misconduct?

## FACTS

[¶ 3]   Tammy Watts worked as a nurse at the Wyoming Honor Farm located in Riverton, Wyoming.  On April 15, 2004, and in accordance with her usual practice, Mrs. Watts reported to work a few minutes before 6:00 o'clock that morning.  Approximately fifty minutes later, her body was discovered in the dental area of the medical office (a.k.a. nurse's office), which was located in the basement of the Administration Building at the Honor Farm. Mrs. Watts was lying "spread eagle" on the floor in a pool of blood.  Her shirt was pulled up over her head, her breasts were exposed, and she was nude from the waist down.  Mrs. Watts had been strangled with an electrical cord and had suffered blunt traumatic injuries to her face and head, as well as cerebral contusions. Mrs. Watts' body showed signs of lividity, indicating she was killed shortly after arriving at work that morning.

[¶ 4]   Investigators initially considered all inmates and staff of the Honor Farm potential suspects.  The investigation into Mrs. Watts' death, however, ultimately focused on Grady.  As a result of the investigation, the State charged Grady with premeditated and felony first degree murder,[1] attempted first degree sexual assault[2] and kidnapping,[3] and sought the death penalty.

[¶ 5]   The case first went to trial on October 31, 2005, in Fremont County, and resulted in a hung jury.[4]   Thereafter, the district court granted Grady's request for a change in venue and transferred the case to Teton County.  Grady's second trial commenced on April 10, 2006.  At trial, the State presented evidence which placed Grady in the vicinity of the Administration Building around the time of Mrs. Watts' murder.  At approxi-

---

1.  Wyo. Stat. Ann. § 6–2–101 (LexisNexis 2007) defines the crime of first degree murder and states in pertinent part:
    (a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault ... kills any human being is guilty of murder in the first degree.

2.  Wyo. Stat. Ann. § 6–1–301 (LexisNexis 2007) defines the crime of attempt and provides in relevant part:
    (a) A person is guilty of an attempt to commit a crime if:
       (i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime. A "substantial step" is conduct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime[.]
    First degree sexual assault is defined in Wyo. Stat. Ann. § 6–2–302 (LexisNexis 2007) and states in pertinent part:
    (a) Any actor who inflicts sexual intrusion on a victim commits a sexual assault in the first degree if:

       (i) The actor causes submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of physical force or forcible confinement[.]

3.  Kidnapping is defined in Wyo. Stat. Ann. § 6–2–201 (LexisNexis 2007) and states in pertinent part:
    (a) A person is guilty of kidnapping if he unlawfully removes another from ... the vicinity where he was at the time of the removal ..., with the intent to:
    (b)
    * * * *
       (ii) Facilitate the commission of a felony; or
    * * * *
    (c) A removal ... is unlawful if it is accomplished:
       (i) By force, threat or deception[.]

4.  At the end of the State's case-in-chief, the district court granted Grady's motion for judgment of acquittal on the kidnapping charge.

mately 5:45 a.m., Grady was seen outside the building's east entrance and, at approximately 6:10 a.m., in the building's laundry area only a few feet from the medical office. Minutes later, Grady was, once again, observed outside the east entrance, at which time he seemed hurried, sweaty and pale, and had what appeared to be blood on his nose.

[¶ 6] The State also presented extensive forensic evidence linking Grady to Mrs. Watts' murder. Mrs. Watts' blood was found on Grady's state-issued blue nylon jacket, which he was seen wearing shortly after the murder and which was later found in his room. Mrs. Watts' DNA was found on a right-handed leather glove recovered from a drainage ditch not far from the Administration Building, and a mixture of Mrs. Watts' DNA and Grady's DNA was found on an identical left-handed glove retrieved from Grady's room. Biological evidence containing a mixture of Mrs. Watts' DNA and Grady's DNA was also found on the jacket Mrs. Watts was wearing at the time of her murder and on the bloody carpet in the dental room. Additionally, evidence consistent with Grady's DNA was found on Mrs. Watts' breasts. Finally, Grady's fingerprints were found on the dental chair that was located next to Mrs. Watts' body.

[¶ 7] In addition, the State's evidence revealed, among other things: Grady was never treated in the dental office; Grady was at the medical office ten times in the previous two weeks, including the day before the murder, and on several occasions Grady was waiting for Mrs. Watts outside the medical office when she arrived at work; Grady wrote several notes to Mrs. Watts, some of which were sexual in nature; Grady was upset with the nursing staff the day before the murder; there was mud on the floor in Grady's room, as well as inmate Christopher Wohletz's adjoining room and their shared bathroom, which was not there the night before Mrs. Watts' murder; and Grady had recently shaved his goatee and pubic hair.

[¶ 8] At the conclusion of trial, the jury found Grady guilty on the charged offenses. The jury declined to impose the death penalty on the murder counts and, instead, opted for a sentence of life imprisonment without the possibility of parole. The district court subsequently sentenced Grady to forty to fifty years on the attempted first degree sexual assault conviction and ordered that the life sentence be served consecutively to that sentence. This appeal followed.

[¶ 9] Additional facts will be set forth in our discussion of the issues raised by Grady.

### DISCUSSION

**A. Exclusion of Alternate Suspect Evidence[5]**

[¶ 10] Prior to Grady's second trial, the State filed a motion to exclude evidence of alternate suspects in the murder of Mrs. Watts until Grady produced an adequate evidentiary basis supporting its admission. The State noted that Grady had indirectly accused inmates Dale Goss, Thomas Bedsaul, Scott Young and Joe Sanchez of murdering Mrs. Watts during his first trial, and that it anticipated Grady would employ the same defense strategy in the second trial. The State asserted that alternate suspect evidence was not admissible unless it established a probative nexus between the alleged suspects and Mrs. Watts' murder. The district court denied the State's motion but ruled it would require Grady to establish at trial a proper foundation for the admission of any proffered alternate suspect evidence under the standard articulated in *United States v. McVeigh*, 153 F.3d 1166 (10th Cir.1998). The district court stated:

As a motion in limine, I'm going to deny the State's motion. I don't perceive that the parties are that far apart in what they understand the law to be here. In fact,— well, they don't disagree as to what the law is, it's just how the Court applies it, I guess, is the central issue. But the quotation from the McVay [sic] case, I think, is appropriate and sets forth the standard.

---

5. There are many terms that courts use to describe this type of evidence, including "alternative suspect," "alternative perpetrator," "third party suspect," "third party perpetrator," and "third party culpability." Because "alternate suspect" is the term coined by Grady, we will use that term in our discussion of this issue.

In fact, the State cited it in their motion, and they [sic] not only cited it, they [sic] highlighted it. Although there is no doubt that the defendant has the right to attempt to establish his innocence by showing that someone else did the crime, the defendant still must show that is [sic] proffered evidence on the alleged alternative perpetrator is sufficient on its own or in combination with other evidence in the record to show a nexus between the crime charged and the assertive [sic] alternative perpetrator. It is not sufficient for a defendant merely to offer up unsupported speculation that another person may have done the crime. Such speculative claiming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on [emotion or] prejudice.

\* \* \* \*

Again, the way I would anticipate it would happen is that if and when [the] defense starts on a line of questioning along those lines, I'll hear an objection. And we'll resolve it when I hear the objection. And that probably will include a request for an offer of proof, otherwise,— in other words, there has to be a foundation before you get to the point, and if there's no foundation, then it's not coming in.

[¶ 11] At trial, and as expected, Grady denied killing Mrs. Watts and sought to introduce evidence that one of the aforementioned inmates, as well as Taylor Kubiak or Cory Warpness, committed the crime. The State objected and, in accordance with its earlier ruling, the district court declined to admit the alternate suspect evidence absent an offer of proof establishing the required nexus between the crime and the alleged alternate suspect. Thereafter, Grady provided an offer of proof which listed the following evidence:

(1) Inmate Dale Goss: Testimony from Sergeant Davis and Tilton Davis (Wyoming State Crime Lab) that Goss' shoes contained an unknown red substance, and that there was an unknown red substance on the carpet in the medical office. Testimony from Jim Nethercott, a caseworker at the Honor Farm, that Goss suffers from violent blackouts during which he commits crimes. Grady noted that previous testimony indicated Goss was in the vicinity at the time of the murder and that he was mentioned as a possible suspect by several people.

(2) Inmate Taylor Kubiak: Testimony by Sergeant Davis that Kubiak's DNA was never tested to see if he was a possible contributor to the unidentified DNA found on Mrs. Watts' breasts and the dental office's carpet. Testimony from Kubiak or his caseworker that Kubiak wrote a note in "May or June" that contained lewd, sexual content and was "derogatory to women." Grady noted that previous testimony indicated Mrs. Watts had received notes that contained lewd, sexual content.

(3) Inmate Scott Young: Testimony from Sergeant Davis that Young was very angry at Mrs. Watts the night before the murder about a write-up and his whereabouts at the time of the murder could not be verified. Photographs depicting scrapes on Young's arms after the murder. Grady noted that previous testimony showed that Young was still ranting and raving about Mrs. Watts at eleven o'clock that night, a mere seven hours before she was killed, and that several inmates and staff members mentioned him as a possible suspect.

(4) Inmate Joseph Sanchez: Testimony from Leah Hornecker that Mrs. Watts was afraid of an inmate matching Sanchez's description who had told Watts, "I had better never catch you alone." Testimony from Correctional Officer Patty Davis that Sanchez had a bubble pack of medicine in his room and had made comments about it the day after the murder. Grady noted that previous testimony indicated that Sanchez, who worked at the mushroom farm, may have been missing from the farm transport bus around the time of the murder.

The district court ruled admissible the alternate suspect evidence pertaining to inmate Young. The district court, however, determined that Grady's offer of proof was insufficient to establish the requisite nexus to allow the evidence regarding Goss, Kubiak, and Sanchez to be presented to the jury.

[¶ 12]   Grady contends the district court deprived him of his constitutional right to present a complete defense when it prohibited him from introducing evidence implicating Goss, Kubiak, and Sanchez in Mrs. Watts' murder.[6]   Generally, we review the district court's evidentiary ruling for an abuse of discretion.   To the extent Grady's claim involves a constitutional issue, we review it *de novo*.   *Hannon v. State*, 2004 WY 8, ¶ 13, 84 P.3d 320, 328 (Wyo.2004).

[¶ 13]   Our recent decision in *Bush v. State*, 2008 WY 108, 193 P.3d 203 (Wyo.2008) controls our resolution of this issue.   In *Bush*, the defendant was charged with first degree murder in connection with the disappearance of his wife.   At trial, the defendant sought to introduce evidence implicating his brother in the wife's disappearance.   The district court disallowed the evidence.   In affirming the district court's decision, we held that a defendant's proffered alternate suspect evidence must demonstrate a direct nexus between the alternate suspect and the crime charged to be admissible.   *Id.*, ¶ 62, 193 P.3d at 218.   If the proffered evidence does not sufficiently connect the alternate suspect to the crime, as, for example, where the evidence is speculative and does nothing more than raise a suspicion, the evidence may properly be excluded.   *Id.*, ¶¶ 68–69, 193 P.3d at 220.   In *Bush*, we held that the defendant's proffered evidence was properly excluded because it failed to establish the requisite link between the brother and the crime charged.

[¶ 14]   In light of *Bush*, we now consider the evidence Grady sought to have admitted to show that Goss, Kubiak or Sanchez committed the murder.   The proffered evidence concerning Goss merely showed that he had a red substance on his shoes and suffered from violent blackouts.   There was no evidence that the red substance was the same substance that was discovered in the medical office, nor was there any evidence

indicating Goss was under the influence of a violent blackout on the morning of the murder.   In this latter regard, there was no evidence indicating the frequency of Goss' blackouts or when they occurred in relation to Mrs. Watts' murder.   In essence, this proffered evidence was purely speculative and did not link Goss to the crime charged.   The district court, therefore, did not err in excluding this evidence.

[¶ 15]   The proffered testimony concerning the absence of DNA testing on Kubiak was apparently intended to show that Kubiak might have been the contributor of some unidentified DNA found on Mrs. Watts' breasts and the dental carpet.   The obvious problem with this proffered evidence is that it did nothing to connect Kubiak to the murder.   Furthermore, the fact that Kubiak penned a letter derogatory to women in May or June did nothing more than raise a suspicion that Kubiak might have written the sexually oriented notes previously received by Mrs. Watts.   It did not, standing alone, establish a nexus between Kubiak and the crime.   We conclude the district court properly excluded this evidence.

[¶ 16]   The same can be said about the testimony concerning Sanchez.   At most, it indicated that Sanchez may or may not have been on the mushroom farm transport bus on the morning of the murder, he possessed a bubble pack of medicine, and that Mrs. Watts feared an inmate matching his description.   Furthermore, there was no evidence when the inmate matching Sanchez's description made the alleged threatening comments to Mrs. Watts.   This evidence did not provide a connection between Sanchez and the crime charged and, consequently, it was properly excluded.

[¶ 17]   As a final matter, Grady contends the district court violated his right to present a defense when it prohibited testimony concerning statements made by Scott Young the night before the murder.[7]   The

---

6.   Grady also asserts error in the exclusion of certain evidence involving inmates Thomas Bedsaul and Cory Warpness.   That evidence, however, was not addressed in Grady's offer of proof in the district court and, consequently, we will not consider it on appeal.

7.   The introduction of this testimony was sought before Grady made his offer of proof on admissibility of alternate suspect evidence.

district court excluded the statements on relevancy and hearsay grounds. Grady presents no argument challenging the legality of the district court's ruling, but merely asserts the statements should have been allowed as alternate suspect evidence. As we noted in *Bush,* a defendant "may introduce any *legal* evidence tending to prove that another person may have committed the crime in which the defendant is charged. Legal evidence is evidence that would be admissible at trial." *Bush,* ¶ 71, 193 P.3d at 220 (emphasis in original). Absent a showing that the statements were legally admissible, we cannot conclude the district court erred in excluding them.

## B. Denial of Motion for Continuance

[¶ 18] We have consistently held that the grant or denial of a motion for continuance is a discretionary ruling of the district court and, unless a clear showing of an abuse of discretion resulting in manifest injustice has been shown by the challenging party, we will not disturb that ruling. *Sincock v. State,* 2003 WY 115, ¶ 25, 76 P.3d 323, 333–34 (Wyo.2003); *Clearwater v. State,* 2 P.3d 548, 553 (Wyo.2000). The determination of whether the district court abused its discretion in refusing to grant a continuance is highly dependent upon the facts and circumstances of the individual case. *Sincock,* ¶ 25, 76 P.3d at 333. On review, our primary consideration is the reasonableness of the district court's decision. *Id.*

[¶ 19] On April 13, three days after the commencement of trial, the State provided Grady with a report compiled by the Wyoming Department of Corrections (DOC) concerning DOC's internal investigation at the Honor Farm. Attached to that report was the personal journal of Correctional Officer Hal Shine, who was on duty the morning of Mrs. Watts' murder. Some of the journal entries,

which were written in early 2005, entailed Shine's observations of Mrs. Watts' nude body shortly after the murder.

[¶ 20] On April 17, Grady filed a notice, pursuant to Wyo. Stat. Ann. § 6–2–312 (LexisNexis 2007),[8] of his intention to introduce the journal at trial. During a hearing on April 19, Grady claimed the journal entries suggested Shine was obsessed with Mrs. Watts and was stalking her, which made him a viable suspect in her murder. Grady contended that the State's late disclosure of Shine's journal, which he maintained violated the district court's discovery order, precluded him from adequately investigating the journal entries and Shine's possible connection to Mrs. Watts' murder.[9] Grady, therefore, orally moved for a continuance of trial, which the State opposed.[10] The State disputed any discovery violation, noting it had received Shine's journal on April 13, the same day it was provided to Grady. The State also disputed the relevancy of Shine's journal, and pointed out the lack of a probative nexus between Shine and Mrs. Watts' murder.

[¶ 21] Noting relevancy concerns, the district court took the matter under advisement. The next morning, after allowing further argument, the district court denied Grady's request for continuance, stating:

All right. I've read the defendant's motion and the addendums and the journals, and I also took time to review Mr. Shine's testimony, actually, from the previous proceedings in this matter. It's information that is interesting, to say the least, but I don't think it's such that it would require the Court to continue this matter. And so I'm going to deny the defendant's motion to continue at this time.

[¶ 22] The only legal argument presented by Grady on appeal is that a continu-

---

8. This statutory provision, commonly referred to as the "Rape Shield Law," sets forth a specific procedure that must be followed if "evidence of the prior sexual conduct of the victim, reputation evidence or opinion evidence as to the character of the victim" is intended to be offered in a prosecution involving a sexual assault offense. Grady disputed the applicability of § 6–2–312 to the admissibility of the journal evidence and filed the notice simply as a cautionary measure.

9. Grady noted that the defense investigator had been investigating the matter, an expert had been reviewing the journals, and that he was "having Mr. Shine flown up."

10. A written motion for a continuance was filed later that day.

ance should have been granted because the State violated the district court's discovery order pertaining to an investigation by DOC at the Honor Farm. The procedural facts of this case, however, reveal no such violation. Originally, the district court set a discovery completion date on this issue of March 10, 2006. However, it was known at the time the discovery order was entered that the investigation was ongoing, which suggested documents might continue to be generated after March 10. In its oral pronouncement accompanying the discovery order, the district court specifically addressed the issue of documents from the investigation stating it hoped the documents could be produced on time but "if it can't be done by then, we'll deal with that when that occurs."

[¶ 23] The issue was revisited at a hearing on April 5, 2006, on Grady's motion to compel production of DOC investigative documents. Such documents had been trickling in but Grady suspected more was out there and was frustrated by the length of time it was taking DOC to complete its investigations and produce final reports. The prosecutor assured the district court he was turning over documents as soon as they were received, which Grady did not contest. The prosecutor also put on a DOC investigator who testified regarding the status of all ongoing investigations and that all available documents had been produced. The end result was a continuance of the status quo. The district court reminded the prosecutor of his continuing duty of production and to produce the investigative documents as they became available. The prosecutor subsequently provided to Grady the journal in question the same day he received it, thereby complying with the discovery orders of the district court.

[¶ 24] The real question, which Grady obliquely refers to on appeal (and argued below), is whether the information in the journal was of such significance as to warrant a continuance after the trial had begun. As noted above, the district court concluded the newly produced information was not sufficiently relevant to necessitate an immediate continuance under the circumstances. We have reviewed the same documents and find the district court did not abuse its discretion in so ruling. The information on its face has only prurient interest. It is too speculative to merit a continuance of the trial.[11]

## C.  Lost Evidence

[¶ 25] On March 8, 2006, the State notified defense counsel about a letter it received from Mr. Watts, the victim's husband, near the end of Grady's first trial, which the State had since misplaced. The letter was reportedly written by Mrs. Watts' former boyfriend with whom she had an affair ten to fifteen years earlier, and whom Mr. Watts had told law enforcement about during a June 7, 2004, interview. The State also informed defense counsel that the Wyoming State Crime Lab had analyzed the letter shortly after its receipt and concluded that Grady was not the letter's author.

[¶ 26] Asserting that the letter was exculpatory evidence and material to his defense, Grady thereafter moved to dismiss with prejudice the criminal action against him on due process grounds, citing *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), and *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). The State naturally opposed the motion, arguing that Grady's due process claim could not be sustained under either *Youngblood* or *Trombetta*. In support of its argument, the State attached the affidavit of Mr. Watts, which states in relevant part:

2.  Near the end of the last trial in *State v. Grady*, following the testimony about the notes found in Tammy Watts' purse, I went home and started looking for other notes.

3.  I found a folded piece of paper that [sic] the bottom of a jewelry box that we both used. I opened the folded paper, discovered it was a letter, and read the letter.

4.  I remember seeing the folded piece of paper in the bottom of the jewelry box

11.  Grady was, of course, free to continue his investigation and renew his motion for a continu-
ance if he found information more concretely tying Shine to Watts' murder.

many time[s] in the past and it was not hidden in any way.

5. After reading the letter, I was sure that Tammy Watts had showed it to me and that I had read it in the past. While I do not remember the content of the letter, the letter was clearly from someone with whom Tammy Watts was engaged in an intimate relationship. The letter was in no way threatening or sinister, but rather friendly.

6. I could not, however, remember exactly when in the past that I had read the letter.

7. The next morning, I gave the letter to Ed Newell and told him that I was sure that the letter was from a past a[sic] affair, which I knew occurred some 10 or 15 years earlier and that I was sure that I had read the letter sometime in the past. However, I thought I should give it to Ed Newell to make sure that the letter was what I thought it was and not something important.

8. I witnessed the State Crime Lab Handwriting Expert examine the letter and very quickly determine it had not been written by Floyd Grady.

9. I was sure then and I am sure now that the letter was from the boyfriend from the long ago extra-marital affair.

10. I do not know what happened to the letter after that.

11. I definitely remember reading the letter in the past and I also remember telling law enforcement about the old affair.

The State also attached a copy of the June 7, 2004, investigation report reflecting Mr. Watts' statements to law enforcement about Mrs. Watts' earlier affair.

[¶ 27] At the ensuing motion hearing, the prosecutor explained why he had not notified the defense about the letter's existence during the first trial. He also explained what he believed happened to the letter and the steps taken to locate it.

Well, Your Honor, as to the why the letter wasn't turned over, it just didn't seem like it mattered. It was evidence of a 15–year–old relationship. It just didn't seem like it mattered. As to what happened to it,—and let me expand on that a little bit. That's the information that we had. It was from a 15–year–old relationship or a 10–year–old relationship or something like that. And we had Richard Crivello say, the defendant didn't write it. We had it tested to determine whether it was exculpatory. As I point out in the brief, you know, tone of letter, the familiar tone, how did Lee Watts describe it—it was obvious somebody was involved in an intimate relationship with his wife.

If the defendant had written it, it would have been exculpatory, and that's why we had it tested. It's turned out it was exactly what we thought it was. We didn't have any reason to think it wasn't what we were told it was and that is that it was evidence of a 15–year–old relationship. So it just didn't seem important. We were on the third or fourth day of the trial. Hadn't heard a word about the old affair that they already knew about. Your Honor, it just did not seem important.

In hindsight, I wish I would have just given them the letter, but what happened to it, I have no earthly idea. There are—I don't know how many thousands of pages of documents, trial transcripts, witness interviews, cassette tapes, attorney's notes, I mean, it's just—it's a lot of information, and I don't know what happened to it. I remember seeing it sitting down there after the trial, after that, I don't know. I honestly don't know.

\* \* \* \*

I myself have gone through the files in our office. I also had Detective Saunders go through whatever he has in his offices, including the evidence that he's got over there. He says it wasn't there. Detective Murphy from RPD and it might have been Detective Saunders and I went through the stuff in the County Attorney's office again, and we still can't find it. You know, unless there's a stash of documents out there that I'm unaware of, which I don't think that there is, we've looked everywhere. Everywhere—you know, everywhere that has anything to do with Grady. You know, if it got stuck in—I mean, that's

what I think happened is it probably got misfiled. It got stuck in some random file or slipped in the crack of some box or something. That's what I think happened, but I don't know that, so I'm not going to represent that to the Court. But we've gone through everything that has anything to do with this case.

[¶ 28] At the conclusion of the hearing, the district court denied Grady's motion to dismiss, concluding that Grady had not established a due process violation under the tests articulated in *Trombetta* and *Youngblood*.[12] The district court found that the letter had no apparent exculpatory value and that it was collateral evidence not directly relevant to the case. The court also determined, based on counsel's representations, that there was no evidence of bad faith on the part of the State.

[¶ 29] On appeal, and without directly challenging the district court's ruling, Grady once again claims his constitutional due process rights were violated when the State, in bad faith, lost what he alleges to be potentially exculpatory evidence. According to Grady, the letter may have been "favorable to the defense in cross-examining the investigators or adducing evidence that Ms. Watts was having an extramarital affair with another person at the Honor Farm." Grady also alleges the State knew the potential value of the letter to his defense and intentionally lost it in order to gain a tactical advantage. We review Grady's constitutional claim *de novo* and afford no deference to the district court's legal determination. *Wilkening v. State*, 2007 WY 187, ¶ 6, 172 P.3d 385, 386 (Wyo. 2007); *Hannon*, ¶ 11, 84 P.3d at 328.

[¶ 30] In *California v. Trombetta*, the United States Supreme Court held that the Due Process Clause does not require law enforcement agencies to preserve breath samples in order to introduce the results of breath-analysis tests at trial. *Trombetta*, 467 U.S. at 491, 104 S.Ct. at 2535. In doing so, the Court noted the officers were acting in good faith and in accord with their normal practice. *Id.* at 488, 104 S.Ct. at 2533. The

Court concluded that whatever duty the Due Process Clause imposes on the government to preserve evidence, it is "limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488, 104 S.Ct. at 2534. Under *Trombetta*, the government violates due process when it destroys evidence (1) whose exculpatory value is apparent before its destruction and (2) is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. at 2534.

[¶ 31] In *Arizona v. Youngblood*, the Supreme Court extended *Trombetta*, holding that where the government fails to preserve "evidentiary material of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant," no due process violation occurs unless the defendant demonstrates the government acted in bad faith. *Youngblood*, 488 U.S. at 57, 109 S.Ct. at 337. To establish a due process violation under *Youngblood* based on the government's failure to preserve evidence, the defendant must show (1) the evidence was "potentially useful" and (2) the government acted in bad faith. *Id.* at 58, 109 S.Ct. at 337. The inquiry into bad faith "must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 n. *, 109 S.Ct. at 336 n. *.

[¶ 32] In this case, Grady's appellate argument relies solely on the *Youngblood* test. Consequently, our focus is on whether Grady has carried his burden of demonstrating that the letter could have been beneficial to his defense and whether the State acted in bad faith in losing it. After a careful review of the record, we must answer both questions in the negative.

[¶ 33] On the first prong of the *Youngblood* test, Grady offers only speculation that the letter had "potential value to the defense" and a feigned suggestion it was writ-

---

12. Neither party presented any witnesses during the hearing. The district court based its decision on counsel's arguments, its knowledge of the

case and the evidence presented during the first trial, and the contents of Mr. Watts' affidavit as well as the June 7, 2004, investigation report.

ten by someone connected with the Honor Farm. Grady's argument ignores the fact, which he has never disputed, that the letter was written ten to fifteen years before Mrs. Watts' murder. Nothing in the record suggests that the identity of the letter's author could have been derived from the letter's contents, much less that the author was in some manner associated with Mrs. Watts or the Honor Farm at the time of the murder. Nor is there anything in the record indicating the letter would have provided Grady with any information beyond that which he had received from the June 7, 2004, reported interview of Mr. Watts, a copy of which he received before the first trial. Given the record in this case, we cannot reasonably conclude the letter would have benefited Grady's defense to the extent it might have exonerated him on the criminal charges. *Youngblood,* 488 U.S. at 57, 109 S.Ct. at 337.

[¶ 34] Moreover, we find no evidence in the record that the State acted in bad faith when it failed to preserve the letter. Grady's contention to the contrary lacks any foundation other than his naked allegation that the State intentionally lost the letter to gain a tactical advantage. As the district court determined, the State provided a reasonable and innocent explanation for what happened to the letter. While we do not condone the State's actions in this case, there is simply no evidence the loss of the letter was anything other than a byproduct of the State's negligence. Mere negligence on the part of the State does not equate to bad faith. *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337–38. In sum, we are satisfied from our review of the record that the State's failure to make the letter available to Grady did not violate his right to due process.

## D. Prosecutorial Misconduct

[¶ 35] Grady's final contention of error alleges several instances of prosecutorial misconduct during closing arguments, which he claims mandate reversal of his convictions. Allegations of prosecutorial miscon-

duct are settled by reference to the entire record and "hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial." *Mazurek v. State,* 10 P.3d 531, 542 (Wyo.2000); *see also Lafond v. State,* 2004 WY 51, ¶ 15, 89 P.3d 324, 329 (Wyo.2004). To the extent Grady did not object at trial to the alleged instances of misconduct, it is incumbent upon him to demonstrate plain error, which demands: (1) the record clearly reflect the incident alleged as error; (2) Grady demonstrate the error violated an unequivocal rule of law in a clear and obvious, not merely arguable, way; and (3) Grady prove the error adversely affected a substantial right resulting in material prejudice to him.[13] *Callen v. State,* 2008 WY 107, ¶ 20, 192 P.3d 137, 145 (Wyo.2008); *Talley v. State,* 2007 WY 37, ¶ 9, 153 P.3d 256, 260 (Wyo.2007). To satisfy the prejudice prong, Grady must demonstrate a reasonable possibility that the outcome of his trial would have been more favorable to him absent the alleged misconduct. *Callen,* ¶ 20, 192 P.3d at 145.

[¶ 36] Grady's first allegation of prosecutorial misconduct is directed at the following highlighted statements made by the prosecutors during closing argument and rebuttal closing argument in the guilt phase portion of the trial, which we have set forth in context (emphasis added):

Instruction five provides you with some guidelines that you need and of interest in the following passage: In deciding any questions before you in this case, you should be governed solely by the evidence. You should not indulge in conjecture or speculation unsupported by the evidence. However, you may consider the evidence presented to you and the reasonable inferences and conclusions which may be drawn from the evidence in light of your knowledge, observation, and experience in the affairs of life. So you should look at the evidence presented, of course, and, of course, the reasonable inferences you can draw from that in deciding whether the State has proven each of the elements of

---

**13.** In a footnote in his brief, Grady urges this Court to adopt the plain error standard employed in *State v. Ramey,* 721 N.W.2d 294 (Minn.2006), which places the burden on the state to prove that the prosecutor's misconduct did not prejudice the defendant's substantial rights. We are not convinced that we should alter existing law on this issue.

each of the charges beyond a reasonable doubt. But what you cannot do is engage in speculation or conjecture that's not supported by the evidence and the facts. **And beware because that's exactly what the defendant may invite you to do.**

In rebuttal closing argument the prosecutor stated (emphasis added):

Take a look at the cover of your jury instructions. What does it say? The State of Wyoming versus Floyd Dewayne Grady. It does not say the State of Wyoming versus the Riverton Police Department. It does not say the State of Wyoming versus the Fremont County Prosecutor's Office. This man is on trial today, not the Riverton Police Department, not the Fremont County Attorney's Office, not the Division of Criminal Investigation for the State of Wyoming. The investigation is not on trial. It is not the sufficiency of the investigation that's at question here. It is the evidence against the defendant. That's what's relevant, and that's what you, the jury, should be looking at.

So why did defense [c]ounsel spend one hour talking to you about the investigation? Because it's an old tried and true tactic. **That's his job. He wants you to look away from the evidence,** because the evidence in this case is absolutely overwhelming. Look at the evidence. Look at the jury instructions. What does it talk about? Does it talk about the investigation? Does it tell you to look at the investigation? No. The jury instructions instruct you, the jury, to look at the evidence against the defendant.

\* \* \* \*

You know, I'm going to leave you with a quote, and the quote talks about the disparity and roles between the prosecution and defense. The difference in our roles as advocates derives from the degree of our authority and disparity of our obligations. Defense [c]ounsel's legitimate and necessary goal is to achieve the best possible result for his client. His loyalty is to the individual client alone. The prosecutor, however, enters a courtroom to speak for the people and not just for some of the people. The prosecutor speaks not solely for the victim or the police or those who support them but for all of the people. That body of the people includes the defendant and his family and those who care about him. **It also includes the vast majority of citizens who know nothing about a particular case but who give over to the prosecutor the authority to seek a just result in their name.**

The evidence in this case—the evidence in this case is absolutely overwhelming, through direct and circumstantial evidence. We, the people, give the case over to you and put it in your hands. Tell the defendant that you now know what he knew then; that he is the one that silenced Tammy Watts. Find him guilty.

[¶ 37] Grady contends the prosecutor's comments impermissibly disparaged defense counsel by suggesting it was counsel's role to "muddy the waters" and divert the jury's attention away from the evidence. He also claims the latter argument improperly bolstered the prosecutor's credibility in that the comments insinuated the prosecutor had more knowledge of the case than the jury and that she was entrusted with this knowledge, as the protector of the community, to seek a "just result." Grady acknowledges he did not object to the challenged comments and, accordingly, bears the burden of demonstrating plain error which, as previously noted, requires him to demonstrate both a transgression of a rule of law and resulting prejudice.

[¶ 38] We need not address the propriety of the prosecutor's comments because Grady has not met his burden of proving he was prejudiced thereby. Grady's prejudice argument consists solely of a single sentence that the "evidence was not overwhelming and [he] did present a plausible defense to the charges." He makes no attempt to explain, in light of the facts of this case, how the challenged statements adversely impacted his trial and, ultimately, the jury's verdict. Suffice it to say, Grady's empty assertion is utterly inadequate to satisfy his burden under the plain error standard. *Callen,* ¶ 22, 192 P.3d at 145; *Doherty v. State,* 2006 WY 39, ¶ 23, 131 P.3d 963, 971 (Wyo.2006); *Bhut-*

*to v. State,* 2005 WY 78, ¶ 44, 114 P.3d 1252, 1268 (Wyo.2005). We therefore summarily reject Grady's claim.

[¶ 39] Grady also claims that misconduct occurred when the prosecutor used the word "rape" twice during closing argument in the guilt phase of his trial and four times during the closing and rebuttal arguments in the penalty phase. According to Grady, the use of the word "rape" violated an order in limine of the district court. In support of this claim, Grady cites to the district court's oral ruling on the State's second notice of intent to introduce evidence, pursuant to W.R.E. 404(b), pertaining to his 1994 conviction for first degree sexual assault (emphasis added):

> THE COURT: The State's Motion Number 24, the State's second notice of intent to introduce evidence pursuant to Wyoming Rule of Evidence 404(B) [sic] will be granted in part and denied in part. The State will be allowed to introduce evidence concerning the following factors from the defendant's prior conviction: Number one, that biological samples, including pubic hair have [been] collected from the defendant in the past for a sexual assault evidence kit. **I don't want to hear the word rape;** number two, that forensic testing in the prior case matched the single pubic hair found in the back seat of the defendant's car to the victim in that case; number three, that the prior victim reported the sexual assault to the authorities; number four, that the defendant was convicted of sexual assault. And I will not allow the State to introduce evidence of the fifth request; that is, the defendant was sentenced to 10 to 30 years for that rape, slash, sexual assault in 1994....
>
> * * * *
>
> Like the first notice, the State proffered in this case, this is a very focused set of facts that the State wants to and I will allow them to introduce. And I've focused it further by eliminating the term "rape" from what the State proposes to show and

even to eliminate the jury being informed that he was convicted of First Degree Sexual Assault.

[¶ 40] After a careful review of the prosecutor's challenged remarks in light of the district court's ruling, we find no merit in Grady's prosecutorial misconduct claim. As can be seen, the district court's ruling only prohibited the prosecutor from utilizing the "rape" term when referring to Grady's 1994 conviction for first degree sexual assault. The instances at issue in the guilt phase closing argument occurred during the prosecutor's discussion of the instant charges for which Grady was on trial—the attempted sexual assault and murder of Mrs. Watts. That discussion did not, in any manner, involve Grady's prior conviction. The prosecutor's use of the term under these circumstances, therefore, was not improper.

[¶ 41] Furthermore, when viewed in context, the district court's ruling only purports to restrict the use of the word "rape" during the State's presentation of the 1994 conviction evidence in the guilt phase portion of Grady's trial. We find no clear indication the district court intended its restriction to apply to the penalty phase. Consequently, we cannot conclude the prosecutor inappropriately employed the term during the penalty phase arguments—whether referring to Grady's prior conviction or the current charges—in direct contravention of the district court's order.

## CONCLUSION

[¶ 42] We find no reversible error with respect to any of the issues raised in this appeal. Affirmed.