# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 101

APRIL TERM, A.D. 2020

*August 3, 2020*

AMBER R. SHIELDS,

**Appellant**
**(Defendant),**

v.

THE STATE OF WYOMING,

**Appellee**
**(Plaintiff).**

S-19-0007, S-19-0269

*Appeal from the District Court of Campbell County*
*The Honorable Michael N. Deegan, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane M. Lozano, Wyoming Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Robin S. Cooper, Senior Assistant Appellate Counsel.

*Representing Appellee:*

Bridget L. Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Kelly D. Mullen, Assistant Attorney General.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    A jury convicted Amber R. Shields of one count of sexual abuse of a minor in the second degree and one count of child endangerment.  The district court sentenced her consecutively to 15 to 20 years for sexual abuse of a minor and one year for child endangerment.  She appeals from her convictions and sentences as well as from the denial of her W.R.A.P. 21 motion for a new trial.  We affirm.

## *ISSUES*

[¶2]    We reorder and state the issues as:

> I. Did the court abuse its discretion when it did not evaluate taint during the competency hearing?
>
> II. Did the court abuse its discretion when it denied Ms. Shields' motion to continue trial?
>
> III. Did the prosecutor commit prejudicial misconduct by eliciting inadmissible 404(b) evidence during trial and engaging in improper closing argument?
>
> IV. Did the court err by denying Ms. Shields' motion for a new trial based on ineffective assistance of counsel?

## *FACTS*

[¶3]    On March 2, 2016, the Gillette, Wyoming Police Department received a complaint there was a sex offender (Charles Mathisen) in the laundry room at an apartment complex.  CL lived in that complex with her mother, Ms. Shields, father, JL, younger sister, ML, and other younger siblings.  Mr. Mathisen was a friend of CL's family and a maintenance worker at the complex.

[¶4]    When Officer Zachary Parker arrived, he observed JL leaving the laundry room and spoke to Mr. Mathisen inside the laundry room.  Officer Parker observed a maintenance room near the laundry room that was stacked with broken dressers, dryers, and bedding.  Behind those items, he found a bucket of urine, a small dollhouse with one figurine in it, and a mattress folded in a cubby hole.  This discovery triggered a criminal investigation of Mr. Mathisen.

[¶5]    Detective Jeremiah Wagner was assigned the case on May 17 and spoke to Ms. Shields that afternoon.  Ms. Shields was not a suspect at the time; Detective Wagner wanted to "feel things out as far as danger to the children."  He filled Ms. Shields in on the

1

investigation and his concerns for her children. Ms. Shields agreed to bring CL in for a forensic interview about Mr. Mathisen. The Department of Family Services (DFS) became involved a couple days later, on receiving a report from law enforcement that Mr. Mathisen might be sexually abusing CL.

[¶6] Detective Wagner scheduled CL's forensic interview for May 31, 2016 at the Children's Advocacy Center in Rapid City, South Dakota. Ms. Shields brought CL to the interview but CL would not interact with the lead forensic interviewer, Brandi Tonkel. When Detective Wagner and DFS employee Dena Knox spoke with Ms. Shields privately to request that she encourage CL to talk to the interviewer, Ms. Shields reacted negatively and yelled at them. Ms. Shields said Mr. Mathisen "was a good man, that he was a churchgoing man, and that she didn't care, or she didn't want to know what he had done to her daughter." She indicated that the last time CL saw Mr. Mathisen was three days earlier—on May 28, 2016. The interview was canceled and Ms. Shields' children were taken into protective custody that afternoon. CL was placed in non-relative foster care with Charlynn Patterson, with whom she lived for the next year and a half.

[¶7] Over the next eight months, Ms. Tonkel interviewed CL four times: on June 21, July 20, and November 4, 2016, as well as January 30, 2017. Based on CL's disclosure about Mr. Mathisen during the July 20 interview, Detective Wagner obtained warrants to arrest Mr. Mathisen and search his home. When police searched Mr. Mathisen's home, they found a bag of hard drives and a modified vibrator in one of his bedrooms. The hard drives contained thousands of pornography images and videos. Dozens of videos depicted CL, and at least five depicted Mr. Mathisen engaged in sexual activity with CL.

[¶8] In May 2017, after approximately one year living in foster care with Ms. Patterson, CL told Ms. Patterson that Ms. Shields had sexually abused her. Ms. Patterson took notes about her conversation with CL and passed that information along to DFS. Ms. Tonkel interviewed CL about the disclosure in a fifth and final forensic interview on July 10, 2017.[1] Criminal charges against Ms. Shields followed.

[¶9] The State charged Ms. Shields with one felony and one misdemeanor in September. Count 1 charged second degree sexual abuse of a minor under Wyo. Stat. Ann. § 6-2-315(a)(iii). The information alleged that between December 1, 2015 and May 31, 2016, Ms. Shields "engaged in sexual contact with a victim who was less than" 18 years old when Ms. Shields was 18 years or older and the victim's legal guardian. The supporting affidavit summarized CL's disclosure that Ms. Shields placed a small pink vibrator in CL's underwear, on CL's "private," and told her to leave it inside her underwear for a "little bit."

---

[1] Ms. Tonkel conducted five full forensic interviews with CL, but, as the district court found, she conducted six total including the canceled interview.

2

[¶10]  Count 2 charged Ms. Shields with misdemeanor child endangerment under Wyo. Stat. Ann. § 6-4-403(a)(ii).  The information alleged that between December 1, 2015 and May 31, 2016, Ms. Shields "knowingly or with criminal negligence caused, permitted or contributed to the endangering of the child's health by violating a duty of care or protection[.]"  More specifically, it alleged that Ms. Shields learned Mr. Mathisen had used CL in the production of child pornography, did not report it, and did not discontinue contact between Mr. Mathisen and CL.  The supporting affidavit summarized CL's disclosure that Ms. Shields watched three videos Mr. Mathisen took of him having sexual intercourse with CL and that Ms. Shields said she "liked the second and third videos better than the first."

[¶11]  The State added four misdemeanor child endangerment counts to the information in November—three pertaining to CL and one pertaining to her younger sister ML.

- Count 3 alleged that between December 1, 2015 and May 27, 2016, Ms. Shields failed to provide adequate supervision between CL and a known sex offender suspected of sexually assaulting her.

- Count 4 alleged that between December 1, 2015 and May 27, 2016, Ms. Shields failed to provide adequate supervision between ML and a known sex offender.

- Count 5 alleged that on May 28, 2016, Ms. Shields failed to provide adequate supervision between CL and a known sex offender suspected of sexually assaulting her.

- Count 6 alleged that between December 1, 2015 and May 28, 2016 Ms. Shields allowed CL to watch Ms. Shields and JL have sexual intercourse.

[¶12] Two attorneys represented Ms. Shields in the trial proceedings.[2]  The court scheduled trial for Monday, July 9, 2018.  Several matters central to this appeal occurred on Friday, July 6.  The court held a competency hearing that morning and found CL competent to testify.  Late that afternoon, the court heard and denied Ms. Shields' motion to continue trial.  At the end of the afternoon hearing, the court informed the parties it had granted the State's recently filed motion to dismiss Counts 3–6.[3]

---

[2] We refer to Ms. Shields' trial counsel as lead counsel and co-counsel.  Lead counsel represented Ms. Shields in her related juvenile proceedings and co-counsel assisted to a lesser extent in those proceedings.

[3] The State moved to dismiss Counts 3–6 on grounds that five charges of child endangerment "might unwittingly confuse the jury and prolong the trial."

[¶13]   Trial proceeded on Counts 1 and 2.[4]   The State's case focused on testimony from CL, Detective Wagner, and Ms. Tonkel.   In addition, several individuals from the Gillette Police Department testified about the investigation of Mr. Mathisen's conduct and the items seized from his home.   DFS employees Ms. Knox and Crystal Canfield testified about their involvement in the case.   Ms. Patterson testified about CL's placement with her and the circumstances in which CL disclosed Mr. Mathisen's and Ms. Shields' abuse.

[¶14]   CL's direct examination was straightforward.   After setting a timeline, 10-year-old CL described her living situation before and at the time of the charged offenses.   She then described her mother, Ms. Shields, placing a pink vibrating vibrator in her underwear, against the outside part of her vagina.   CL stated she had never seen a vibrator before.   CL also testified that "Chuck," meaning Mr. Mathisen, touched her vagina and made videos with her.   CL said she was standing in the hallway of the family's apartment when she saw Chuck show the videos to her mother.

[¶15]   On cross-examination, CL admitted she had visited with several people, some many times, about the vibrator and the videos.   CL indicated she enjoyed going to Rapid City because after the interviews she got to shop for toys and eat out.   When asked about her mother watching Chuck's videos, CL admitted she was not close enough to see what was on the screen.   She also testified she had made a mistake earlier when she said she had never seen a vibrator before.   Chuck used vibrators on her, but never a pink one.   On re-direct, CL indicated none of the individuals she had spoken to about the vibrator or the videos told her what to say.   Although she could not see the screen of Chuck's camera, she remembered her mother asking Chuck, "[I]s that my daughter?"

[¶16]   On her direct examination, Ms. Tonkel discussed her qualifications and explained the general protocols for a forensic interview.   She addressed her research and experience regarding why children lie, how time could moderate poorly asked questions, and how disclosure was generally a process rather than a one-time event.   She testified that she used an extended interview process with CL because of CL's recent contact with Mr. Mathisen and also because the abuse had initially come to light through means other than CL's voluntary disclosure.

[¶17]   Ms. Tonkel then testified about her July 10, 2017 forensic interview with CL.   In that interview, CL told Ms. Tonkel that Mr. Mathisen showed her mother three videos. When her mother watched each video, her mother asked Mr. Mathisen "Is that my daughter?" and Mr. Mathisen responded "Yes."   CL indicated the videos were of CL and Mr. Mathisen.   CL spelled out on a piece of paper what she and Mr. Mathisen were doing, writing down "S E X."   Ms. Tonkel further testified that CL made a disclosure about Ms. Shields and a vibrator, as well as Mr. Mathisen and a vibrator, but CL indicated the

---

[4] On the State's motion at trial, the court amended the date range on both counts to allege Ms. Shields committed the offenses between March 10, 2015 and May 31, 2016.

vibrators were different. CL "described the kid's vibrating toy as being pink in color, because it was her favorite color and her mom knew it was her favorite color." CL demonstrated with her fingers that the toy was about two inches long. CL said her mother put the kid-sized vibrating toy in CL's underwear.

[¶18] The overarching defense at trial was that CL genuinely believed her mother had abused her but Mr. Mathisen, who "is a monster," had actually perpetrated the abuse. Trial counsel advanced other peripheral arguments through cross-examination and in closing argument.[5] For example, they argued the State was misconstruing Ms. Shields as uncooperative with the investigation; emphasized that CL only mentioned Ms. Shields in one interview; asserted Ms. Tonkel asked CL the same question three times and CL only named Ms. Shields in response to the third question; suggested Ms. Patterson inappropriately questioned CL; pointed out that CL claimed Ms. Shields abused her in a three-bedroom apartment, but the family lived in a two-bedroom apartment during the relevant time period; and emphasized CL's admission that she could not hear or see anything on the screen when Mr. Mathisen allegedly showed the videos to her mother.

[¶19] The jury convicted Ms. Shields of both counts. The court sentenced her consecutively to 15 to 20 years for second degree sexual abuse of a minor and one year for child endangerment. Ms. Shields filed a timely notice of appeal challenging her convictions and sentences (Appeal No. 19-007).

[¶20] Ms. Shields subsequently filed a W.R.A.P. 21 motion, seeking a new trial based on ineffective assistance of counsel. The district court denied her motion following hearing. Ms. Shields appealed from that denial (Appeal No. 19-0269). We consolidated both appeals.

## DISCUSSION

### I. The court did not abuse its discretion when it did not evaluate taint during the competency hearing.

[¶21] Ms. Shields asserts the court abused its discretion when it found CL competent to testify without addressing taint. We review the scope of the court's competency determination for an abuse of discretion. *See Griggs v. State*, 2016 WY 16, ¶ 33, 367 P.3d 1108, 1123 (Wyo. 2016). A court is not required to conduct a separate taint hearing or expand a competency inquiry to also address taint unless trial counsel either specifically requests a taint hearing or formally presents some evidence of taint prior to trial. *Id.* Neither occurred here.

---

[5] The defense called two witnesses—Ms. Shields' mother and stepfather—but cross-examination diminished the value of their testimony to the defense.

[¶22] Instead, trial counsel requested only a competency hearing. The court allowed the parties to submit questions for the court to ask CL. Neither side submitted proposed questions. After the court examined CL at hearing, it asked whether either side wanted the court to inquire into any specific area. Neither the defense nor the prosecution sought additional inquiry. The State argued CL was competent and the defense agreed. The court found CL competent pursuant to the five-part test adopted in *Larsen v. State*, 686 P.2d 583, 585 (Wyo. 1984).[6] It did not abuse its discretion by failing to address the possibility of taint sua sponte. *Griggs*, ¶ 33, 367 P.3d at 1123.

## II. The court did not abuse its discretion when it denied Ms. Shields' motion to continue trial.

[¶23]   We have consistently held that the grant or denial of a motion for continuance is a discretionary ruling of the district court and, unless a clear showing of an abuse of discretion resulting in manifest injustice has been shown by the challenging party, we will not disturb that ruling. *Sincock v. State*, 2003 WY 115, ¶ 25, 76 P.3d 323, 333–34 (Wyo. 2003); *Clearwater v. State*, 2 P.3d 548, 553 (Wyo. 2000). The determination of whether the district court abused its discretion in refusing to grant a continuance is highly dependent upon the facts and circumstances of the individual case. *Sincock*, ¶ 25, 76 P.3d at 333. On review, our primary consideration is the reasonableness of the district court's decision. *Id.*

*Id.* ¶ 75, 367 P.3d 1108, 1131–32 (quoting *Grady v. State*, 2008 WY 144, ¶ 18, 197 P.3d 722, 729 (Wyo. 2008)). Ms. Shields has provided no basis for us to disturb the court's ruling.

---

[6] Under the five-part *Larsen* test, a child witness must demonstrate:

> (1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which [she] is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words [her] memory of the occurrence; and (5) the capacity to understand simple questions about it.

*Gruwell v. State*, 2011 WY 67, ¶ 19, 254 P.3d 223, 229 (Wyo. 2011) (quoting *Woyak v. State*, 2010 WY 27, ¶ 21, 226 P.3d 841, 850–51 (Wyo. 2010)). "The issue of taint does not have to be addressed at a separate hearing but can usually be adequately tested under the third factor of the *Larsen* test—'a memory sufficient to retain an independent recollection of the occurrence.'" *Griggs*, ¶ 30, 367 P.3d at 1123. "When there is a specific allegation of taint, the analysis of the third competency element should be expanded[.]" *Id.* (outlining "[t]he factors that should be considered in assessing the reliability of a complaint regarding sexual offenses" when there is a specific taint allegation).

6

[¶24]  Ms. Shields moved to continue trial after the State sent what trial counsel considered "new" witness statements at 3:34 p.m. on the Friday before trial.  The motion informed the court that the statements significantly altered the planned defense, trial counsel needed additional time to investigate and prepare an adequate defense, and the State had no objection to a continuance.  The court heard Ms. Shields' motion that afternoon.

[¶25]  The witness statements consisted of two emails CL's foster mother, Ms. Patterson, originally sent DFS in 2017 and then forwarded to the County Attorney's Office that week. The first email recounted CL's sexualized behavior in the foster home and statements CL claimed Ms. Shields made to CL.  The defense acknowledged the email contained hearsay on hearsay, and asserted the statements were "somewhat consistent" with the State's allegations but far more detailed.  The second email recounted CL's responses to questions Ms. Patterson asked CL about Ms. Shields' alleged abuse.  The defense characterized these statements as far more detailed than anything contained in the forensic interviews or police reports, and claimed the statements changed some information the defense thought the State would present at trial.  Lead counsel informed the court that she did not think she could fulfill her ethical obligation to Ms. Shields without investigating the statement and whether there was something else out there that CL might testify about at trial.

[¶26]  The court expressed reservations.  First, it noted that the information contained in the emails had been available to both parties.  They could have interviewed the foster parent or subpoenaed DFS records.  Second, trial counsel had filed its motion at the eleventh hour and the court explained it would be difficult to find four or five days for a jury trial within a reasonable time.  Third, the court expressed concern about how a continuance might affect CL.  In denying the motion, the court reiterated that both sides could have obtained the information months ago.  The court could not identify how Ms. Shields would be prejudiced if trial proceeded as scheduled, as the defense had all weekend to go through the material.  For all the court knew, Ms. Patterson's emails might "be grist for cross-examination" and benefit the defense.

[¶27]  The court's reservations and ruling were reasonable under the circumstances. Equally important, Ms. Shields has not shown how denial of a continuance prejudiced her defense, much less resulted in manifest injustice.  Trial counsel had opportunity to review the emails and adjust their defense accordingly.  Moreover, the second email proved useful. Lead counsel used it on cross-examination to suggest Ms. Patterson inappropriately questioned CL.  Lead counsel also used the second email on cross-examination of Ms. Tonkel—she conceded that she would not typically encourage a foster parent to participate in the kind of conversation Ms. Patterson had with CL, when CL disclosed Ms. Shields' abuse.  On these facts, we conclude the district court did not abuse its discretion when it denied Ms. Shields' motion to continue.[7]

---

[7] Ms. Shields argues for the first time on appeal the court should have continued trial because the State dismissed Counts 3–6 at the last minute, fundamentally changing the defense strategy.  In support of her

### III. The prosecutor did not commit prejudicial misconduct.

[¶28] "Prosecutorial misconduct is '[a] prosecutor's improper or illegal act (or failure to act), [especially] involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Dixon v. State*, 2019 WY 37, ¶ 37, 438 P.3d 216, 231 (Wyo. 2019) (quoting *Craft v. State*, 2013 WY 41, ¶ 13, 298 P.3d 825, 829 (Wyo. 2013)). Ms. Shields "bears the burden of establishing prosecutorial misconduct." *Id*. ¶ 41, 438 P.3d at 231 (citing *Condra v. State*, 2004 WY 131, ¶ 5, 100 P.3d 386, 389 (Wyo. 2004)).

[¶29] On the first day of trial, the defense moved to preclude the State from introducing evidence pertaining to dismissed Counts 3–6 on grounds that it constituted W.R.E. 404(b) evidence. The State informed the court it did not intend to introduce evidence regarding Count 6 but presented alternative arguments why it should be permitted to introduce evidence regarding Counts 3–5. The court sustained the defense's motion, ruling "there will be no reference to any of the activities involved in what was previously framed up as" Counts 3–6. Before opening statements, the court reminded the State "to be wary and careful about eliciting, advertently or probably inadvertently, from any of your witnesses, or on opening remarks, any material relative to those Counts."

[¶30] Ms. Shields contends the prosecutor nevertheless elicited testimony regarding the dismissed counts from Ms. Knox, Detective Wagner, and Ms. Canfield, and referenced evidence regarding dismissed Count 5 in closing argument. She further contends the prosecutor used evidence related to dismissed Count 5 in closing argument to inflame the jury's passion and prejudice. She argues the cumulative effect of those errors prejudiced her.

[¶31] We conclude the prosecutor did not utilize 404(b) evidence to inflame the passion or prejudice of the jury. And even if the prosecutor committed misconduct by eliciting 404(b) testimony and mentioning 404(b) evidence in closing argument, Ms. Shields was not prejudiced.

#### A. Standard of Review

[¶32] The parties dispute the applicable standard of review. Ms. Shields argues we should review for harmless error because, although she did not object to the prosecutor's conduct at trial, she did file a pretrial demand for notice of the State's intent to introduce 404(b)

---

argument, she directs our attention to lead counsel's testimony at the Rule 21 hearing that dismissal of Counts 3–6 "completely blew our trial strategy up." Ms. Shields presented no such argument in her motion to continue or at hearing. Because this is not a jurisdictional issue and Ms. Shields presents no argument or authority that it is so fundamental we must consider it, we "adhere to '[o]ur general rule . . . that we will not consider issues not raised in the court below.'" *State v. John*, 2020 WY 46, ¶ 53 n.10, 460 P.3d 1122, 1136 n.10 (Wyo. 2020) (quoting *Williams v. Tharp*, 2017 WY 8, ¶¶ 10–11, 388 P.3d 513, 517 (Wyo. 2017)).

8

evidence. The State maintains we should review for plain error because Ms. Shields did not object to the alleged prosecutorial misconduct. Whether we review for harmless or plain error "our ultimate focus and attention is on whether the alleged error affected [Ms. Shields'] substantial right to a fair trial." *Bogard v. State*, 2019 WY 96, ¶ 18, 449 P.3d 315, 321 (Wyo. 2019) (citations omitted).

## B. Argument Calculated to Inflame the Jury's Passion or Prejudice

[¶33] "In evaluating closing argument, we recognize that counsel is allowed wide latitude; the prosecutor may comment on all of the evidence and may suggest reasonable inferences from the evidence." *Id.* ¶ 19, 449 P.3d at 321 (citing *Teniente v. State*, 2007 WY 165, ¶ 30, 169 P.3d 512, 524 (Wyo. 2007)). "We measure the propriety of closing arguments in the context of the entire argument and compare them with the evidence produced at trial." *Id.* (quoting *Doherty v. State*, 2006 WY 39, ¶ 18, 131 P.3d 963, 969 (Wyo. 2006)). "[I]t is well-settled that 'arguments calculated to inflame the passion or prejudice of the jury violate ABA Standards for Criminal Justice regarding argument to the jury.'" *Id.* ¶ 67, 449 P.3d at 331 (quoting *Black v. State*, 2017 WY 135, ¶ 33, 405 P.3d 1045, 1056 (Wyo. 2017)). Such arguments "are improper because they pose a risk that the accused may be convicted for reasons wholly irrelevant to his guilt or innocence." *Buszkiewic v. State*, 2018 WY 100, ¶ 27, 424 P.3d 1272, 1281 (Wyo. 2018) (quoting *Strange v. State*, 2008 WY 132, ¶ 6, 195 P.3d 1041, 1044 (Wyo. 2008)).

[¶34] In closing argument, the prosecutor stated:

> And after law enforcement brings this to her attention, shows her, and talks to her about the room, the maintenance room with the hidden bed and the bucket full of urine, she allows Charles Mathisen contact with her daughter. Well, is that contact unsupervised? Who cares if that's unsupervised or not. How can you let him have any sort of contact with your daughter? Once you know what he is, and once law enforcement discusses their concerns with you. Was it unsupervised? Who cares? So she endangers the life or health of [CL] by violating the duty of care or protection that she's got as a mother, as a parent in the home, as the primary caregiver.

Ms. Shields argues these statements mentioned 404(b) evidence regarding dismissed Count 5—which specifically alleged that on May 28, 2016, Ms. Shields failed to provide adequate supervision between CL and a known sex offender suspected of sexually assaulting her—and "were an obvious attempt to involve feelings of anger, indignation, and outrage in the jury about Ms. Shields allowing contact between Mr. Mathisen and C.L." on May 28, 2016.

9

[¶35]   Though the challenged statements clearly reference Ms. Shields' supervision of CL or lack thereof, the record makes clear the prosecutor permissibly made those statements in the course of addressing the evidence supporting each element of Count 2, misdemeanor child endangerment, and providing the jury a framework in which to view that evidence. *See Buszkiewic*, ¶ 27, 424 P.3d at 1281 (citation omitted) (noting the prosecutor is "entitled to reflect upon the evidence and to draw reasonable inferences from that evidence in order to assist the jury in its function").

[¶36]   To convict Ms. Shields of Count 2, the State had to prove beyond a reasonable doubt that on or between March 10, 2015 and May 31, 2016, Ms. Shields "4. Being the parent of a child under the age of sixteen (16) years, C.L.; 5. Having a duty of care or protection to that child; 6. Knowingly; 7. Did permit the endangering of the child's life or health; 8. By violating that duty of care or protection." The prosecutor argued Ms. Shields had a duty to protect CL, knew the danger Mr. Mathisen posed to CL because he showed her videos of him and CL engaged in sexual activity, and yet—alluding to the May 28, 2016 contact between Mr. Mathisen and CL—she did nothing to protect CL. The prosecutor reasonably argued it did not matter whether the contact was supervised or unsupervised in response to the defense's cross-examination of Detective Wagner and Ms. Knox about the nature of CL's contact with Mr. Mathisen on May 28, 2016.[8]   He concluded that Ms. Shields endangered CL's life or health and violated her duty of care or protection by allowing any contact between CL and Mr. Mathisen and by failing to call the police or take other action after learning about the videos. When viewed in context, the prosecutor's argument was not designed to inflame the passions or prejudice of the jury or to encourage it to decide the case on anything other than the evidence presented at trial to support a conviction on Count 2. That the prosecutor may have alluded to 404(b) evidence in framing the evidence supporting Count 2 is a separate issue we address next.

## C. Eliciting Improper Testimony and Engaging in Improper Argument

[¶37]   "[I]t is . . . misconduct for a prosecutor to ignore a trial court's W.R.E. 404(b) order and, thus, knowingly bring inadmissible evidence to the jury's attention." *Bogard*, ¶ 51, 449 P.3d at 327.  On direct examination, Ms. Knox and Detective Wagner each testified about Ms. Shields' statement at the first forensic interview that Mr. Mathisen had contact with CL three days prior, on May 28, 2016. The prosecutor also referenced this contact in closing argument, both in providing the jury a timeline of events and in discussing the evidence supporting Count 2. Ms. Shields argues the prosecutor thus violated the court's 404(b) order by eliciting testimony and engaging in argument regarding dismissed Count 5, which specifically pertained to the May 28, 2016 contact between Mr. Mathisen and CL.

---

[8] Detective Wagner and Ms. Knox each acknowledged on cross-examination that Ms. Shields had not said whether the contact was supervised or unsupervised.

[¶38] In addition, Ms. Knox and Ms. Canfield each testified about their June 6, 2016 meeting with Ms. Shields and JL regarding custody. Ms. Knox testified that CL was taken into custody on May 31 because her family did not appear to be protecting her. Ms. Canfield testified that there was a conversation "between the Gillette Police Department and DFS about potential protective custody of the children" because they were concerned about Ms. Shields' ability to "protect the kids from further abuse." Ms. Shields argues this testimony violated the court's 404(b) order because it referred to dismissed Count 3, as well as the duty to protect children other than CL referenced in Count 4.[9]

[¶39] Even if Ms. Knox's, Detective Wagner's, and Ms. Canfield's testimony and the prosecutor's reference to the same in closing violated the court's W.R.E. 404(b) order, the cumulative effect of those errors did not prejudice Ms. Shields. "[A] series of . . . errors will only be cause for reversal where the accumulated effect constitutes prejudice and the conduct of the trial is other than fair and impartial." *Bogard*, ¶ 69, 449 P.3d at 332 (quoting *Sam v. State*, 2017 WY 98, ¶ 61, 401 P.3d 834, 855 (Wyo. 2017)). "[W]e evaluate the possibility of prejudice in the context of the entire record." *Id.* ¶ 70, 449 P.3d at 332 (citing *Hathaway v. State*, 2017 WY 92, ¶ 33, 399 P.3d 625, 634 (Wyo. 2017)).

[¶40] The most important factor in our prejudice analysis is the strength of the State's case. *Id.* ¶ 72, 449 P.3d at 332. We agree with the district court's assessment of the evidence presented at Ms. Shields' trial:

> [T]he court cannot abjure what it necessarily concludes to be a compelling feature of the jury's verdict: it surely found persuasive the clear and strong testimony of C.L., not as fantasy or the fruit of confusion, but as fact. This observation does not denote a failure of trial counsel's defense theory; it is only to say the jury was apparently not so convinced in light of all of the State's evidence, and, in particular, the testimony of C.L.

CL's testimony, though succinct, was compelling and closely corroborated by evidence of Mr. Mathisen's videos and Ms. Tonkel's and Ms. Patterson's testimony about CL's disclosures.

[¶41] Another important consideration is that the alleged prosecutorial misconduct does not "relate[] to a material, consequential fact[.]" *Bogard*, ¶ 72, 449 P.3d at 332. It does not go "to the very heart" of the case—CL's credibility as to the allegations about her

---

[9] Count 3 alleged that between December 1, 2015 and May 27, 2016, Ms. Shields failed to provide adequate supervision between CL and a known sex offender suspected of sexually assaulting her. Count 4 alleged that between December 1, 2015 and May 27, 2016, Ms. Shields failed to provide adequate supervision between ML and a known sex offender.

mother's sexual abuse (Count 1) and knowledge of Mr. Mathisen's videos (Count 2). *Cf. id.* ¶ 81, 449 P.3d at 334. The prosecutor elicited the challenged testimony from Ms. Knox, Detective Wagner, and Ms. Canfield to explain peripheral matters such as why the first forensic interview did not take place and why the State took CL into custody.

[¶42] During closing argument, the prosecutor first mentioned the May 28, 2016 contact as he provided the jury a timeline of events. He later alluded to the May 28, 2016 contact when he discussed how the evidence established each element of Count 2, *see supra* ¶ 36. As shown above, that second reference was vague and brief. The prosecutor mentioned no specific dates and his statement did not go to the crux of dismissed Count 5 (whether Ms. Shields adequately supervised CL on May 28, 2016) or CL's credibility pertaining to her mother's knowledge of the danger Mr. Mathisen posed to CL (Count 2). That Ms. Shields permitted any type of contact with CL after finding out about the videos may have helped to prove Count 2, but it was not material or consequential. The jury could have concluded Ms. Shields placed CL's life and health at risk based solely on evidence she failed to report Mr. Mathisen's conduct after seeing the videos.

[¶43] For these reasons, we conclude the alleged misconduct did not affect Ms. Shields' substantial right to a fair trial. *Bogard*, ¶ 18, 449 P.3d at 321.

## IV. *The court did not err by denying Ms. Shields' motion for a new trial.*

[¶44] The standard by which we review ineffective assistance of counsel claims is well established:

> A criminal defendant has the right to the effective assistance of counsel. U.S. Const. amend. VI; Wyo. Const., art. 1, § 10; *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984) ("[T]he right to counsel is the right to the effective assistance of counsel." (quotations omitted)). When a defendant claims he has been denied that right, he must show <u>both</u> that counsel's performance was deficient, and he was prejudiced as a result. *Galbreath v. State*, 2015 WY 49, ¶ 5, 346 P.3d 16, 18 (Wyo. 2015); *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Counsel acts deficiently when he "fail[s] to render such assistance as would have been offered by a reasonably competent attorney." *Galbreath*, ¶ 5, 346 P.3d at 18 (quoting *Bloomer v. State*, 2010 WY 88, ¶ 18, 233 P.3d 971, 976 (Wyo. 2010)). "Prejudice occurs when there is 'a reasonable probability that, absent counsel's deficient assistance, the outcome of [appellant's] trial would have been different.'" *Id*. (quoting *Bloomer*, ¶ 18, 233 P.3d at 976). A failure to establish one of the two prongs dooms an ineffective

assistance of counsel claim. *Dettloff v. State*, 2007 WY 29, ¶ 19, 152 P.3d 376, 382 (Wyo. 2007).

Ineffective assistance of counsel claims are "mixed questions of law and fact." *Griggs v. State*, 2016 WY 16, ¶ 37, 367 P.3d 1108, 1124 (Wyo. 2016). We defer to a district court's factual findings unless clearly erroneous; we review de novo the court's legal conclusions, including whether counsel's conduct was deficient and whether defendant was prejudiced as a result. *Id*. We "invoke[ ] a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment. [T]he paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance." *Schreibvogel v. State*, 2010 WY 45, ¶ 47, 228 P.3d 874, 889 (Wyo. 2010) (citations and quotations omitted).

*Winters v. State*, 2019 WY 76, ¶¶ 11–12, 446 P.3d 191, 198–99 (Wyo. 2019) (emphasis in original).

[¶45] Ms. Shields raises four ineffective assistance of counsel claims on appeal. The district court included fact findings as to each of those claims in its Rule 21 order. Ms. Shields does not challenge those findings as clearly erroneous. Consequently, we defer to those findings as we consider each of her claims. *Id.* ¶ 12, 446 P.3d at 199.

### A. Criminal Law Experience and Training

[¶46] Rule 1.1 of the Wyoming Rules of Professional Conduct for Attorneys at Law mandates that attorneys "provide competent representation to a client" and states that "[c]ompetent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." The comments illuminate the meaning of competent representation, stating in relevant part:

Legal Knowledge and Skill.

[1] In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter and whether it is feasible to refer the matter to, or associate or consult with, a

lawyer of established competence in the field in question. In many instances, the required proficiency is that of a general practitioner. Expertise in a particular field of law may be required in some circumstances.

[2] A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar. A newly admitted lawyer can be as competent as a practitioner with long experience. Some important legal skills, such as the analysis of precedent, the evaluation of evidence and legal drafting, are required in all legal problems. Perhaps the most fundamental legal skill consists of determining what kind of legal problems a situation may involve, a skill that necessarily transcends any particular specialized knowledge. A lawyer can provide adequate representation in a wholly novel field through necessary study. Competent representation can also be provided through the association with a lawyer of established competence in the field in question.

. . . .

[4] A lawyer may accept representation where the requisite level of competence can be achieved by reasonable preparation.

. . . .

Thoroughness and Preparation.

[5] Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence.

Wyo. R. Prof. Conduct 1.1, Comments 1, 2, 4, 5.

[¶47] Ms. Shields asserts trial counsel violated Rule 1.1 because they lacked sufficient criminal law experience and training to defend her. According to Ms. Shields, a case

involving sexual abuse of a minor is complex and requires specialized understanding of the case law and scientific literature associated with disclosure by children, which neither trial counsel had.

[¶48]   Relevant to this claim the trial court found:

> 51.   [Lead counsel] has been a member of the Wyoming State Bar since October 2008. She worked first as a law clerk for the Sixth Judicial District Court for three (3) years, then as a Deputy Campbell County and Prosecuting Attorney for two (2) years, before finally opening her own law firm approximately six (6) years ago.

> 52.   [Lead counsel] described her law practice as consisting of approximately seventy percent (70%) juvenile law and the other thirty percent (30%) a variety of family law, criminal law, adoptions, guardianships and other small legal matters.

> 53.   [Lead counsel] testified she did not have any specialized training in criminal law, other than her experience working cases. As a prosecutor, she participated in at least three (3) jury trials; a felony, a juvenile neglect, and a misdemeanor.

> 54.   Prior to the criminal charges being filed, as well as while they were pending, [lead counsel] acted as Defendant's appointed counsel in a related juvenile case.

> 55.   When Defendant was first charged criminally, [lead counsel] testified the charges were a series of misdemeanors. And, although she discussed with Defendant whether Defendant wanted to be represented by the Public Defender's Office in the criminal matter, Defendant indicated it was her desire to continue with [lead counsel].

> 56.   Having represented the Defendant for approximately a year as her juvenile attorney, [lead counsel] believed the Defendant was aware of her legal job history and the fact her practice was devoted largely to juvenile law.

> 57.   [Lead counsel] undertook the representation of Defendant in the criminal matter *pro bono*.

> 58.    [Lead counsel's] associate . . . assisted in Defendant's criminal case.
>
> 59.    [Co-counsel] has been a member of the Wyoming State Bar since September 2014. He worked first as a Deputy Campbell County and Prosecuting Attorney for a little over two (2) years, then worked briefly for a private criminal defense firm in Gillette, before joining [lead counsel's law firm], where he worked for approximately a year and a half.
>
> 60.    [Co-counsel] testified at the time of Defendant's trial, he had sat at the table, as one of two trial counsel, in approximately eleven (11) trials.

[¶49] Ms. Shields takes no issue with these findings and instead premises her claim on the bald assertion that a case involving sexual abuse of a minor is complex and thus requires specialized knowledge about disclosures by children. She has cited no authority and we have found none that requires defense attorneys in cases involving charges of sexual abuse of a minor to have specialized training and experience. Deferring to the district court's fact findings, we conclude trial counsel demonstrated "the legal knowledge, skill, thoroughness and preparation reasonably necessary" to represent Ms. Shields. Wyo. R. Prof. Conduct 1.1.

### B. Review of and Familiarity with Discovery

[¶50] "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Pickering v. State*, 2020 WY 66, ¶ 62, 464 P.3d 236, 256 (Wyo. 2020). An "investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities." *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S.Ct. 2456, 2466, 162 L.Ed.2d 360 (2005) (quoting 1 ABA Standards for Criminal Justice 4–4.1 (2d ed. 1982 Supp.)). It follows that counsel must "make some effort to learn the information in the possession of the prosecution and law enforcement authorities." *Id.* at 387 n.6, 125 S.Ct. at 2466 n.6.

[¶51] Relying on the grounds asserted in the defense's motion to continue trial—that trial counsel needed additional time to prepare because of two emails with "new" witness statements—Ms. Shields contends trial counsel failed to thoroughly review and be familiar with discovery.

[¶52] Relevant to this claim the trial court found:

> 70.    [Lead counsel] testified, in looking at her time in respect to Defendant's juvenile case, she and [co-counsel] collectively

16

worked 300 hours -although, insofar as the juvenile case itself, she estimated [co-counsel's] hours were probably only 10 to 20.

71. Because Defendant's cases (criminal and juvenile) were so intertwined, [lead counsel] testified she would have difficulty separating out hours devoted strictly to the criminal case. However, she indicated it would be fair to say, between the two cases, she and [co-counsel] worked 300 plus hours.

72. While [co-counsel] estimated, conservatively, he had devoted over one hundred (100) hours to the criminal case alone from the time he became involved until the day the jury trial commenced.

73. Both [trial counsel] agreed the case was a "discovery nightmare."

74. According to [lead counsel], discovery consisted of pages and pages of documents and disk after disk of videos. Paper-wise, discovery filled two letter-sized banker's boxes and [lead counsel] estimated she had between 75 and 100 disks of information, although many of those were duplicative.

75. [Lead counsel] testified she reviewed all discovery in both cases. She had already examined most of the materials extensively in the juvenile case and much of it was rediscovered to her two or three times in the criminal case.

76. Discovery often came in piecemeal and trickled in continually as [trial counsel] prepared for trial.

. . . .

78. The [Defendant's] motion to continue was based upon two (2) emails Defense counsel had received from the State around 3:34 p.m. One contained a statement from C.L.'s foster parent to DFS and one contained a journal the foster parent had been keeping of C.L.'s disclosures that she shared with DFS. Both emails indicated they had been sent to DFS the previous year.

79.     The court denied the request for a continuance when it became clear the information in the emails was not inconsistent with the allegations made by the State against the Defendant and because both sides had been in a position to vet the foster parent prior to trial.

80.     At the [Rule 21] hearing, Defendant's current counsel (Appellate Division, State Public Defender) pointed out the text of the emails which were the subject of the motion to continue had, in fact, been disclosed to Defendant's trial counsel. They were essentially buried on page 23 of a previously disclosed police report.

81.     [Lead counsel] testified she did not remember the emails and noted this police report was one of many such reports discovered and rediscovered to the defense. And, every time it was provided to her, it had additional pages attached. [Lead counsel] testified she reviewed all additional pages when they came in, but apparently did not register these emails.

82.     [Co-counsel] likewise testified he did not recall the police report which referenced the emails and indicated it was possible the report had slipped his mind as this case involved "a lot of pages of discovery." Although, he too had reviewed the discovery thoroughly as it was provided and later on as the case progressed towards trial.

83.     [Lead counsel] indicated by the time of trial, she had reviewed the discovery multiple times and had sorted out what was duplicative and what was not. For trial, she had one binder which contained the originals of every document.

(Footnote omitted.)

[¶53]   Ms. Shields does not contest that trial counsel had reviewed and were familiar with discovery when trial commenced. "[W]e have stated that an appellant cannot prove ineffective assistance of counsel for failure to investigate 'where an appellant fails to identify the favorable evidence or witnesses that additional investigation would have revealed.'" *Brock v. State*, 2012 WY 13, ¶ 17, 272 P.3d 933, 938 (Wyo. 2012) (quoting *Asch v. State*, 2003 WY 18, ¶ 41, 62 P.3d 945, 958–59 (Wyo. 2003)). Ms. Shields has not identified how trial counsels' further review of and familiarity with the materials they received from the State before trial would have benefited the defense or otherwise affected

the trial outcome. Trial counsel did not perform deficiently with respect to its pretrial investigation and no prejudice showing has been made.

## C. Vetting Taint Pretrial

[¶54] Taint involves more than just intentional manipulation. "[C]hildren can be susceptible to suggestive interview techniques and [] such techniques can undermine the reliability of a child's account of actual events[.]" *English v. State*, 982 P.2d 139, 145 (Wyo. 1999) (citation omitted). "Undue suggestiveness can occur when an interviewer has a preconceived notion of what has happened to a child, the interviewer uses leading questions, the interviewer is a trusted authority figure, the person accused of wrongdoing is vilified during the interview, or the interviewer uses threats or rewards to pressure the child." *Griggs*, ¶ 30, 367 P.3d at 1122 (quoting *English*, 982 P.2d at 146 (citations omitted)). Accordingly, "[w]hen there is a specific allegation of taint," a court should expand its competency analysis. *Id.*; *see supra* n.6.

[¶55] Ms. Shields argues trial counsel provided ineffective assistance by "[n]ot vetting a pretrial taint issue when the trial defense was taint." She insists trial counsel's false memory defense was a taint defense. She further asserts trial counsel did not recognize this because they incorrectly viewed taint as limited to purposeful manipulation of a child.

[¶56] Relevant to this claim the trial court found:

> 86. As indicated above . . . [lead counsel] testified she observed Judge Rumpke conduct an *in-camera* interview with C.L. in the juvenile case.
>
> 87. And, as noted above in the court's factual findings related to the history of this case, this court held a Competency/Taint hearing in relation to C.L. on July 6, 2018 at 9:00 o'clock A.M.
>
> 88. At the Competency/Taint hearing, C.L. was the only witness called and the court alone made inquiry of her in relation to the *Larsen* factors. At the conclusion of her testimony, [lead counsel] averred, based upon C.L.'s answers to the court's questions, the defense was not going to challenge her competency.
>
> 89. The court ultimately found C.L. to be competent and entered an order to that effect.

19

90.     Both [trial counsel] indicated the theory of their defense was not taint, but rather that C.L. genuinely believed the events she testified about in relation to her mother occurred. But, C.L. was, in fact, mistaken and essentially transferring the trauma form the sex acts committed by Charles Mathisen onto the Defendant.

91.     [Co-counsel] described the defense theory as basically "a traumatic transference of blame" as opposed to alleging the child had been coached or fed information. [Co-counsel] testified he was not aware of any witness, expert or otherwise, who might have been called to establish C.L.'s testimony was the product of "taint."

92.     To this end, in [lead counsel's] questioning of Brandi Tonkel, the State's expert witness, she elicited testimony from Ms. Tonkel that it was possible a child could tell an interviewer her parents knew about abuse when they did not, simply because the child wished the parents had known. Ms. Tonkel also admitted C.L. initially identified only "Chuck" as the person who had taught her about vibrators.

93.     [Lead counsel] also testified she consulted with a number of other attorneys (including esteemed and experienced defense counsel at the Nick Carter Law Firm) in Gillette, Wyoming about how to handle certain aspects of the case, including how to question C.L. on the stand and how to cross-examine Ms. Tonkel.

94.     [Co-counsel] testified he sat in on at least one of these counsel-to-counsel consultations with [lead counsel], although he testified he did not personally seek out additional consultations.

(Footnote omitted.)

[¶57]  As these findings show, the defense was not taint as Ms. Shields now suggests, though it did involve some peripheral arguments regarding taint in the form of suggestive questioning by Ms. Patterson and Ms. Tonkel. More importantly, regardless of how the defense is characterized, "[t]here is no evidence . . . that a reasonably competent attorney would have requested a separate taint hearing" under the circumstances. *See Griggs*, ¶ 50, 367 P.3d at 1127. Ms. Shields called an experienced defense attorney as an expert witness at the Rule 21 hearing but he did not address the issue of vetting taint pretrial nor did Ms.

Shields provide other testimony or evidence to support this claim or demonstrate prejudice. To the extent the defense advanced a peripheral taint argument at trial, trial counsel implemented sufficient safeguards through cross-examination of Ms. Patterson and Ms. Tonkel and closing argument. *See Peterson v. State*, 2012 WY 17, ¶¶ 21–23, 270 P.3d 648, 655 (Wyo. 2012) (concluding trial counsel did not perform deficiently when he did not raise the issue of taint at the competency hearing because he implemented appropriate safeguards through cross-examination, made the victim's credibility an issue, and successfully advanced evidence of taint and the implication that the alleged abuse was a product of taint).

[¶58]   In sum, Ms. Shields has failed to show that had trial counsel raised a pre-trial taint argument, it would have prevented CL from testifying, or that by presenting the taint evidence only at trial her chances of acquittal were lessened. *See id.* ¶ 23, 270 P.3d at 655. Her "failure to make the required showing of deficient performance and resulting prejudice defeats [her] ineffectiveness claim." *Id.* (citation omitted).

### D. Ms. Tonkel's Cross-Examination

[¶59]   The extent of cross-examination is a strategic decision. *Winters*, ¶ 48, 446 P.3d at 208 (citing *Barkell v. State*, 2002 WY 153, ¶ 23, 55 P.3d 1239, 1244 (Wyo. 2002)).   There are risks associated with excessive cross-examination: "the witness may reconcile inconsistencies, additional unfavorable testimony may be elicited, and ineffective efforts to attack credibility may in fact enhance the witness's testimony." *Id.* (quoting *Barkell*, ¶ 23, 55 P.3d at 1244).   "Speculation as to how the cross-examination could have been conducted differently does not meet the *Strickland* test for ineffective assistance." *Jackson v. State*, 2019 WY 81, ¶ 24, 445 P.3d 983, 990 (Wyo. 2019) (quoting *Barkell*, ¶ 23, 55 P.3d at 1244).

[¶60]   Ms. Shields challenges the quality of lead counsel's cross-examination of Ms. Tonkel, asserting lead counsel was "unprepared to advance the theory of a 'bad disclosure' or 'false memory' through meaningful questioning" and "failed to press Ms. Tonkel" on pretrial statements favorable to the defense.   She further suggests lead counsel abandoned cross-examination because she feared the jury's reaction, reflecting surrender rather than strategy.

[¶61]   Relevant to this claim the trial court found:

> 107.   Ms. Brandi Tonkel is the lead forensic interviewer at the Children's Home Advocacy Center in Rapid City, SD.   She conducted six (6) forensic interviews with C.L.

108.  Although Ms. Tonkel was the State's final (and expert) witness, [lead counsel] testified she also relied on Ms. Tonkel to essentially be her expert witness.

109.  [Lead counsel] had observed Ms. Tonkel testify on multiple occasions and had attended one of her presentations in Campbell County, along with [co-counsel].

110.  [They] felt a lot of the information presented by Ms. Tonkel during the presentation (including information on statements and arguments) were actually very favorable to the Defendant's position.  After the presentation, [lead counsel] spoke to Ms. Tonkel specifically about the Defendant's case.

111.  Having observed and spoken with Ms. Tonkel, [lead counsel] was of the view that Ms. Tonkel's responses to questions she intended to pose at trial would adequately cover everything the defense intended to present.  And, in the long run, it would look better having the State's expert answer those questions rather than bringing in a different expert specially retained by the defense.

112.  In her testimony, [lead counsel] indicated, in her observations and conversations with Ms. Tonkel, Ms. Tonkel talked a great deal about how kids will report what they wished had happened – as opposed to what really happened.

113.  After one of her presentations, [lead counsel] discussed with Ms. Tonkel, for example, one accusation made by C.L. that while she was being molested by Charles Mathisen, her grandfather had watched through the window.  However, as C.L.'s apartment was on the second floor, it would have been physically impossible for her grandfather to watch through the window.

114.  [Lead counsel] and Ms. Tonkel also talked informally about how kids can get things "jumbled up" in their minds and say a certain person did one thing when it was really a different person.

115.  At the [Rule 21] hearing, [lead counsel] indicated she expected Ms. Tonkel to testify at Defendant's trial along the lines they had discussed.

22

116.    But, when her testimony did not go as expected (as [lead counsel] described it, Ms. Tonkel testified with "a lot of spin…and very pro-prosecution"), [lead counsel] indicated she did press Ms. Tonkel on her prior statements.

117.    However, [lead counsel] admitted she did not press Ms. Tonkel too hard as the jury, which seemed hostile to the defense from the beginning, seemed to grow increasingly displeased with her questioning.  [Lead counsel] described Ms. Tonkel as "fighting on every question."

118.    During her cross-examination of Ms. Tonkel, [lead counsel] took a brief break to consult with [co-counsel] to determine how the testimony was being received.

119.    [Co-counsel] advised he had been watching the jury and they appeared to be having a strong negative reaction (i.e. dissatisfaction) to [lead counsel's] questioning of Ms. Tonkel.

120.    Essentially, [co-counsel] described the jury as being very taken with Ms. Tonkel and increasingly upset when it appeared [lead counsel] was attacking Ms. Tonkel.

[¶62]   As the district court found, from lead counsel's perspective at the time, not only was Ms. Tonkel testifying with a pro-prosecution spin, but the jury seemed hostile to the defense and appeared to react negatively when she pushed Ms. Tonkel too hard.  Lead counsel's strategy therefore was to press Ms. Tonkel on her prior statements but not too hard.  Lead counsel was not unprepared to advance the defense theory.  Both the court's findings and the trial transcript reflect that by the time lead counsel ended cross-examination, she had obtained a considerable amount of testimony favorable to the defense, which trial counsel then utilized in closing argument.

[¶63]   Further, Ms. Shields' conclusion that there would have been no harm in pressing Ms. Tonkel if trial counsel "considered the jury was already lost" cannot withstand scrutiny. *Jackson*, ¶ 24, 445 P.3d at 990.  If the jury was already lost, then failure to press Ms. Tonkel could not have been prejudicial.  Lead counsel did not necessarily view the jury as lost.  Her testimony reflects she was attempting to minimize the negative effect that pressing Ms. Tonkel too hard could have on a jury who seemed hostile to the defense.  Excessive cross-examination under such circumstances carried risk—it may have allowed Ms. Tonkel to walk back statements favorable to the defense, elicited unfavorable testimony, or inadvertently enhanced Ms. Tonkel's or CL's credibility. *See Winters*, ¶ 48, 446 P.3d at 208.

[¶64] "[C]ross-examination technique is an aspect of trial strategy which is best left to the trial attorney rather than to the supervision of appellate courts." *Bruckner v. State*, 2018 WY 51, ¶ 22, 417 P.3d 178, 183 (Wyo. 2018) (quoting *Mraz v. State*, 2016 WY 85, ¶ 48, 378 P.3d 280, 292 (Wyo. 2016)). "The fact that trial counsel may have pursued a different strategy" by continuing to press Ms. Tonkel on her pretrial statements does not prove counsel's assistance ineffective. *Id.*

### *CONCLUSION*

[¶65] The district court did not abuse its discretion when it did not evaluate taint sua sponte or when it denied Ms. Shields' motion to continue trial, and the prosecutor did not commit prejudicial misconduct. We therefore affirm Ms. Shields' convictions and sentences. We also affirm the district court's denial of Ms. Shields' Rule 21 motion for a new trial because she failed to show trial counsel were constitutionally ineffective.