# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 12

OCTOBER TERM, A.D. 2021

January 26, 2022

ANDREW WAYNE STEPLOCK,

Appellant
(Defendant),

v.

S-20-0160, S-21-0050

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Natrona County*
*The Honorable Daniel L. Forgey, Judge*

***Representing Appellant:***
> Office of the State Public Defender: Diane Lozano, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Robin S. Cooper, Senior Assistant Appellate Counsel. Argument by Ms. Cooper.

***Representing Appellee:***
> Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Catherine M. Mercer, Assistant Attorney General. Argument by Ms. Mercer.

***Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.***

\*Justice Davis retired from judicial office effective January 16, 2022, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2021), he was reassigned to act on this matter on January 18, 2022.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    Andrew Wayne Steplock confessed that he broke into his parents' house and killed his mother.  The jury convicted him of felony murder, second-degree murder, aggravated burglary, and possession of a deadly weapon.  On appeal, Mr. Steplock argues that the district court abused its discretion in denying his motion to continue the trial and erred by rejecting his W.R.A.P. 21 motion for new trial based on ineffective assistance of counsel.  We affirm the conviction but remand for correction of illegal sentence.

## *ISSUES*

[¶2]    Mr. Steplock presents two issues, which we have rephrased:

> 1.  Did the district court abuse its discretion when it denied Appellant's morning of trial motion to continue?
>
> 2.  Did the district court err in denying Appellant's Rule 21 motion for new trial due to ineffective assistance of counsel?

## *FACTS*

[¶3]    On the morning of February 25, 2019, Mr. Steplock, who had a key to his parents' home, went to their house where he argued with his mother about his custom of making unannounced visits to the home.  Following the argument, Mr. Steplock asked, and his mother agreed, that he could take a shower there.  While Mr. Steplock showered, his mother switched his house key with a fake key hoping to prevent further uninvited visits.  After showering, Mr. Steplock left.

[¶4]    Later that evening, Mrs. Steplock and her husband, Dr. Steplock, watched television until around 10:30 p.m. when Dr. Steplock went to bed.  Mrs. Steplock followed him to the bedroom to settle the family dogs before returning downstairs.  Dr. Steplock fell asleep until sometime after 12:56 a.m. when he was awakened by the security alarm.  After calling out to Mrs. Steplock and receiving no response, he ran downstairs to the den because he knew Mrs. Steplock, who often stayed up until three or four in the morning, was usually there.  He did not see her in the den but spotted her lying unconscious on her back near the front door.  As he frantically called out and shook her, he noticed a small pool of blood on the floor just below her left ear.  He called 911.

[¶5]    Shortly thereafter, the police arrived.  One officer applied pressure to Mrs. Steplock's head while the other searched the house for an intruder.  The officer discovered the back door was open with its window broken from the outside.  He continued to sweep

the house but did not find anyone else inside.  The paramedics arrived and transported Mrs. Steplock to the hospital where she later died.

[¶6]    During the investigation, the police learned of Mr. Steplock's argument with his mother.  The police also learned that Mr. Steplock appeared unconcerned when family members had called to tell him that his mother was hurt and in the hospital.  Based on the information, Mr. Steplock became a suspect in his mother's shooting.  The police made several attempts to reach Mr. Steplock, but these efforts were unsuccessful.  Casper police detective, Jesse Jones, tracked Mr. Steplock's cell phone and discovered that on the day of the murder, Mr. Steplock's phone had traveled from Casper to Cheyenne and then to Aurora, Colorado, before heading back north.  Using this information, the police located Mr. Steplock at a truck stop north of Denver, Colorado, and arrested him.

[¶7]    Following his arrest, Mr. Steplock confessed to killing his mother.  He told the police that he went to his parents' house to steal money.  When he arrived, his house key would not unlock the front door, so he went to the back door where he broke the door window, reached inside, and turned the deadbolt key to gain entry to the house.  His mother, who was in the living room, asked what he was doing.  Instead of answering, he walked toward her, pointed the gun, and pulled the trigger.  The security alarm sounded, and he fled.

[¶8]    Mr. Steplock was charged with felony murder, second-degree murder, aggravated burglary, and possession of a deadly weapon.  He pled not guilty and not guilty by reason of mental illness (NGMI).  Prior to the initial date of trial, August 26, 2019, the district court ordered a psychological evaluation.  Dr. Elizabeth Donegan, a licensed psychologist with the Wyoming State Hospital, evaluated Mr. Steplock.  Her report was originally due July 29, 2019, but technology issues had prevented access to Mr. Steplock's police interviews, so the Wyoming State Hospital requested a thirty-day extension.  The district court granted the extension and, to accommodate the new deadline, continued the trial until November 18, 2019.  Dr. Donegan conducted her evaluation on June 25, 2019.  Mr. Steplock claimed for the first time during this evaluation that he was suffering from hallucinations and demons directed his actions.  In her report, submitted on August 28, 2019, she concluded that Mr. Steplock did not "lack[] substantial capacity, as a result of mental illness or deficiency, to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law at the time of the alleged offenses."  Mr. Steplock moved for a second psychological evaluation, which the court granted on September 11, 2019.

[¶9]    Defense counsel then submitted a request for funding for the evaluation to the public defender committee—a five-member committee composed of experienced defense attorneys.  This committee evaluates and approves or denies any funding request in aid of

2

trial that exceeds $1,500.[1]  In determining whether to approve or deny funding, the committee reviews any information that the attorneys provide.  For NGMI cases, the information provided may include prior evaluations, history of psychiatric treatments or diagnoses, social history, and other relevant background information.  Here, Mr. Steplock's prior treatment records were unavailable.  The committee relied on Dr. Donegan's evaluation in making its decision.  It denied funding for a second psychological evaluation.  At the Rule 21 hearing, the State Public Defender testified:

> [E]ssentially, the committee felt that there didn't seem to be
> evidence consistent with . . . [a] defense for not guilty by reason
> of mental illness.  Not [a] lot of talk about whether or not the
> State Hospital report was valid; but that there didn't seem to be
> any evidence that Mr. Steplock was struggling to conform his
> conduct or didn't understand right from wrong.

Mr. Steplock did not receive a second psychological evaluation.

[¶10]  A few weeks before trial, defense counsel made a request to the State for Dr. Donegan's litigation support package (her notes and the basis for her evaluation) to determine whether she had conducted any testing on Mr. Steplock during her evaluation.  The State told defense counsel to make his request directly to the Wyoming State Hospital, which he did.  When the hospital indicated there was no litigation support package, defense counsel attempted to contact Dr. Donegan directly.  Dr. Donegan did not return his calls until the Thursday preceding trial scheduled to begin on Monday.  On that Thursday, Dr. Donegan told defense counsel that she did not conduct any testing and her report was based solely on her notes and observations.  The next day, defense counsel hired Tricia Miller, a licensed counselor, to conduct a series of personality tests on Mr. Steplock.  On Monday, the first day scheduled for trial, defense counsel supplemented his witness list adding Ms. Miller.  The State objected to Ms. Miller as an expert witness arguing unfair surprise and that Ms. Miller, a licensed counselor, did not qualify as a designated examiner pursuant to statute.[2]  The district court accepted the State's objections and ruled that Ms. Miller would not be allowed to testify.[3]  Despite being previously denied funding and having taken no

---

[1] The State Public Defender formed this committee to provide more guidance to public defender trial counsel on when to hire experts.  She explained that the purpose of the committee is not to solely approve experts but "anytime an attorney needs something in [a] case above and beyond what my office generally provides, they have to fill out what is called an Expense Authorization Form."

[2] Wyo. Stat. Ann. § 7-11-305(c) states "[o]nly the designated examiners who examined the defendant pursuant to W.S. 7-11-303 or 7-11-304 are competent witnesses to testify as to the defendant's mental responsibility."  Wyo. Stat. Ann. § 7-11-305(c) (LexisNexis 2021).  A designated examiner is defined as "a licensed psychiatrist, or other physician with forensic training or a licensed psychologist with forensic training[.]"  Wyo. Stat. Ann. § 7-11-301(a)(i).  Ms. Miller, a licensed counselor, is neither a licensed psychiatrist nor psychologist and did not qualify as a designated examiner.

[3] Defense counsel was able to use Ms. Miller's testing on Mr. Steplock to attack Dr. Donegan's report and testimony at trial.

alternative measures to secure a second psychological evaluation, Mr. Steplock also moved for a continuance claiming that he needed a second evaluation. The district court denied the motion, finding:

> [T]here's not good cause to continue the trial at this time. There's been plenty of time and opportunity to try to address those issues in advance of trial. The Court has already granted a continuance due to the State Hospital['s] problems,[4] and it's been several months since the evaluation was received. So if that's the reason, I think we need to proceed.

[¶11] The trial proceeded as scheduled. As part of Mr. Steplock's NGMI defense, his counsel cross-examined Dr. Donegan challenging her evaluation; cross-examined Mr. Steplock's father about Mr. Steplock's behavior as a child and behavior changes through his teenage years; presented testimony from Mr. Steplock's sister on her observations of her brother's personality and temperament; and Mr. Steplock testified in his own defense. Dr. Donegan's testimony is addressed below. *See infra* ¶ 25. Dr. Steplock testified, that as a teenager Mr. Steplock started getting into trouble at school and began performing poorly academically, and then as an adult he started isolating himself from friends and family. Mr. Steplock's sister testified that in the last four years Mr. Steplock isolated himself by not attending family functions, struggled to keep a job, and told her that he felt out of his mind.

[¶12] Mr. Steplock testified that when he broke into his parents' house he was suffering from hallucinations. These had started around February 19 or 20—a few days before the murder. His hallucinations started with the appearance of two human girls, who he believed were demons. These demons accepted him into the blood god's army,[5] trained him, and told him what to do. He testified that on the night of the murder:

> [T]here was a newer demon that had showed up. . . . [S]he told me she was 9,000 years old and that she was helping me run from all of these other demons that had been released from hell. She told me she was there to help me and this and that. So we spent the majority of the night running around—running around from other demons. And then once it was all gone away, done away, she convinced me to go to my parents' house and told me that they weren't going to be home; the alarm was off; and the doors were unlocked; and I could actually use their

---

[4] The district court's reference to the State Hospital's problems is directed at the thirty-day extension and the continuance granted for the submission of Dr. Donegan's psychological evaluation report. *See supra* ¶ 8.

[5] Dr. Donegan researched the blood god's army and discovered that the blood god, Khorne, and his army are from the video game *Warhammer*.

. . . house for safekeeping, I guess, for a little bit and . . . live a
little bit nicer.

According to Mr. Steplock, when he arrived at his parents' house:

> [The demon] told me to go pull into the garage. She told me
> to go to the back door and try that. When that didn't work, she
> told me to go to the front door and try that door. And when
> that didn't work, she told me to go back to the back door and
> break out the window. And so I did that. And then when I got
> . . . inside the house, walked through the kitchen and that other
> room in front of my mom, she told me to shoot [my mom]. So
> I shot her. And the alarm started going off and I ran.

His hallucinations continued as he drove to Colorado:

> And then it was somewhere on that road that it made . . .
> me wonder if this was even a demon. I remember saying that;
> are you even that—are you even that demon. And she turned
> into Satan. Now it was no longer that 9,000-year-old demon
> sitting next to me. There's a tall, large object. He was red. He
> was tall and lengthy, with a human body, and . . . it looks like
> Satan. So it turned out to be Satan.

[¶13] A jury convicted Mr. Steplock of all counts for which he was charged—felony murder, second-degree murder, aggravated burglary, and possession of a deadly weapon. He was sentenced to life in prison for felony murder, fifty-five years to life for second-degree murder, ten to fifteen years for aggravated burglary, and three to five years for possession of a deadly weapon, all sentences to run concurrently. Mr. Steplock filed a W.R.A.P. 21 motion for new trial based on ineffective assistance of counsel. The district court denied the motion. Mr. Steplock appeals the district court's denial of his motion for continuance and his motion for new trial based on ineffective assistance of counsel. Additional facts will be presented as relevant.

## DISCUSSION

**I.** **Did the district court abuse its discretion when it denied Appellant's morning of trial motion to continue?**

**A.** **Standard of Review**

[¶14] "[T]he grant or denial of a motion for continuance is a discretionary ruling of the district court and, unless a clear showing of an abuse of discretion resulting in manifest

injustice has been shown by the challenging party, we will not disturb that ruling." *Pickering v. State*, 2020 WY 66, ¶ 78, 464 P.3d 236, 259 (Wyo. 2020) (quoting *Palomo v. State*, 2018 WY 42, ¶ 10, 415 P.3d 700, 703 (Wyo. 2018)). "The determination of whether the district court abused its discretion in refusing to grant a continuance is highly dependent upon the facts and circumstances of the individual case." *Shields v. State*, 2020 WY 101, ¶ 23, 468 P.3d 1097, 1105 (Wyo. 2020) (quoting *Griggs v. State*, 2016 WY 16, ¶ 75, 367 P.3d 1108, 1131–32 (Wyo. 2016)). "On review, [the] primary consideration is the reasonableness of the district court's decision." *Pickering*, ¶ 78, 464 P.3d at 260 (quoting *Palomo*, ¶ 10, 415 P.3d at 703).

## B.      Analysis

[¶15]  Mr. Steplock argues the district court abused its discretion in denying his motion to continue because without a second psychological evaluation to support his NGMI defense, he was unprepared for trial, which resulted in manifest injustice.  We disagree.

[¶16]  Several cases are instructive.  In *Shields*, the defendant moved for a continuance on the Friday preceding trial scheduled on Monday.  *Shields*, ¶¶ 12, 24, 468 P.3d at 1103, 1105.  The defendant argued that two new witness statements provided by the State had "significantly altered the planned defense" and warranted a continuance.  *Id.* ¶ 24, 468 P.3d at 1105.  The district court disagreed, finding that the witness statements consisted of two emails originally sent to DFS and then forwarded to the County Attorney's Office the previous year.  *Id.* ¶ 25, 468 P.3d at 1105.  The district court also noted the defense could have interviewed the foster parents or subpoenaed DFS records during that time.  *Id.* ¶ 26, 468 P.3d at 1106.  The district court further found the defendant would not be prejudiced if the trial proceeded as scheduled.  *Id.*  On appeal, we held that the district court's ruling was reasonable under the circumstances and that the defendant had failed to meet her burden of establishing manifest injustice.  *Id.* ¶ 27, 468 P.3d at 1106.

[¶17]  In *Steinfeldt*, five days before sentencing, the defendant's newly hired counsel requested a continuance which the district court granted.  *Steinfeldt v. State*, 2018 WY 20, ¶ 5, 411 P.3d 418, 419 (Wyo. 2018).  Shortly before the rescheduled sentencing hearing, the defendant again changed counsel.  *Id.*  Prior to the rescheduled sentencing, the defendant moved for a second continuance to obtain a psychological evaluation.  *Id.*  The district court denied this motion.  *Id.*  The defendant renewed her motion for a continuance at the sentencing, and the district court again denied the motion.  *Id.* ¶ 6, 411 P.3d at 419. The defendant appealed arguing that the psychological evaluation "might have resulted in potentially mitigating evidence that she should have been able to present prior to the imposition of sentence" and that it "could have affected the sentence, even if it was only a slight reduction."  *Id.* ¶ 10, 411 P.3d at 420.  On appeal, we affirmed, finding "[t]o the extent that Ms. Steinfeldt's psychological history was a relevant consideration for sentencing, or that a psychological evaluation might be warranted, those facts were apparent upon the filing of the presentence report in November [2016].  However, it

6

appears that Dr. Turlington was not contacted until February 2017." *Id.* ¶ 12, 411 P.3d at 421. Moreover, we found "[n]either Dr. Turlington's report, nor Ms. Steinfeldt's motion, indicated how her treatment history or her anxiety and depressive disorders may have affected her behavior in any way that might influence the court's sentencing determination," and "[s]he has provided no such explanation to us on appeal." *Id.* ¶ 17, 411 P.3d at 422.

[¶18] Here, the district court denied Mr. Steplock's motion for continuance after considering that he had the time and opportunity to secure a second psychological evaluation. The court granted his motion for a second psychological evaluation on September 11, 2019. Trial did not start until November 18, 2019. Mr. Steplock requested funding for a second evaluation. When his request was denied, Mr. Steplock did not seek reconsideration of the denial and made no effort to obtain a second psychological evaluation.

[¶19] Mr. Steplock bears the burden of establishing the denial of a continuance prejudiced his defense and resulted in manifest injustice. *See Shields*, ¶ 23, 468 P.3d at 1105. As in *Steinfeldt*, he does not show how a second psychological evaluation would have changed or contradicted Dr. Donegan's conclusions. He has failed to demonstrate how the district court's denial of his motion to continue prejudiced his defense, much less how it resulted in manifest injustice. The district court did not abuse its discretion in denying Mr. Steplock's motion to continue trial.

## II. Did the district court err in denying Appellant's Rule 21 motion for new trial due to ineffective assistance of counsel?

### A. Standard of Review

[¶20]    The standard by which we review ineffective assistance of counsel claims is well established:

> A criminal defendant has the right to the effective assistance of counsel. U.S. Const. amend. VI; Wyo. Const., art. 1, § 10; *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984) ("[T]he right to counsel is the right to the effective assistance of counsel." (quotations omitted)). When a defendant claims he has been denied that right, he must show both that counsel's performance was deficient, and he was prejudiced as a result. *Galbreath v. State*, 2015 WY 49, ¶ 5, 346 P.3d 16, 18 (Wyo. 2015); *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Counsel acts deficiently when he "fail[s] to render such

7

assistance as would have been offered by a reasonably competent attorney." *Galbreath*, ¶ 5, 346 P.3d at 18 (quoting *Bloomer v. State*, 2010 WY 88, ¶ 18, 233 P.3d 971, 976 (Wyo. 2010)). "Prejudice occurs when there is 'a reasonable probability that, absent counsel's deficient assistance, the outcome of [appellant's] trial would have been different.'" *Id.* (quoting *Bloomer*, ¶ 18, 233 P.3d at 976). A failure to establish one of the two prongs dooms an ineffective assistance of counsel claim. *Dettloff v. State*, 2007 WY 29, ¶ 19, 152 P.3d 376, 382 (Wyo. 2007).

Ineffective assistance of counsel claims are "mixed questions of law and fact." *Griggs v. State*, 2016 WY 16, ¶ 37, 367 P.3d 1108, 1124 (Wyo. 2016). We defer to a district court's factual findings unless clearly erroneous; we review de novo the court's legal conclusions, including whether counsel's conduct was deficient and whether defendant was prejudiced as a result. *Id.* We "invoke[] a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment. [T]he paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance." *Schreibvogel v. State*, 2010 WY 45, ¶ 47, 228 P.3d 874, 889 (Wyo. 2010) (citations and quotations omitted).

*Neidlinger v. State*, 2021 WY 39, ¶ 53, 482 P.3d 337, 351–52 (Wyo. 2021) (quoting *Shields*, ¶ 44, 468 P.3d at 1109–10); *see also Winters v. State*, 2019 WY 76, ¶¶ 11–12, 446 P.3d 191, 198–99 (Wyo. 2019).

## B.     Analysis

[¶21]   Mr. Steplock argues that his defense counsel performed deficiently in failing to obtain a second psychological evaluation and by failing to timely recognize that Dr. Donegan had not performed testing. He argues that there is a reasonable probability that, but for these errors, the result of his trial would have been different.

[¶22]   "We may dispose of an ineffective assistance claim solely on the prejudice prong." *Jendresen v. State*, 2021 WY 82, ¶ 37, 491 P.3d 273, 285 (Wyo. 2021) (citing *Sides v. State*, 2021 WY 42, ¶ 34, 483 P.3d 128, 137 (Wyo. 2021)); *see also Richmond v. State*,

2021 WY 111, ¶ 13, 496 P.3d 777, 781 (Wyo. 2021) ("[A] court can decide an ineffective assistance claim on the prejudice prong without considering the deficient performance prong." (quoting *Yazzie v. State*, 2021 WY 72, ¶ 21, 487 P.3d 555, 563 (Wyo. 2021))). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Leners v. State*, 2021 WY 67, ¶ 21, 486 P.3d 1013, 1018 (Wyo. 2021), *cert. denied*, 142 S.Ct. 410 (2021) (quoting *Fairbourn v. State*, 2020 WY 73, ¶ 62, 465 P.3d 413, 428 (Wyo. 2020)); *see also McNaughton v. State*, 2016 WY 112, ¶ 12, 384 P.3d 276, 278 (Wyo. 2016); *Sen v. State*, 2013 WY 47, ¶ 39, 301 P.3d 106, 121 (Wyo. 2013). Here, we address only the dispositive element of prejudice. To show prejudice, Mr. Steplock must show that absent defense counsel's deficiencies "there is a reasonable probability the outcome of the trial would have been more favorable to the appellant." *Richmond*, ¶ 12, 496 P.3d at 781 (citing *Yazzie*, ¶ 20, 487 P.3d at 562).

[¶23] It is undisputed that Mr. Steplock shot his mother. The issue is whether defense counsel's failure to secure a second psychological evaluation and failure to timely recognize that Dr. Donegan had not performed testing prejudiced his NGMI defense.

[¶24] At trial, Mr. Steplock testified that he broke into his parents' house and killed his mother because he was experiencing hallucinations. He described a 9,000-year-old demon who had convinced him to go to his parents' house and told him to shoot his mother, which he did. This is not the story he told in his police interview which was played for the jury. He told the police that he went to his parents' house to steal money from the wine cellar. When he arrived, his front door key would not work, so he broke in through the back door. When he saw his mother, he shot her. He made no mention of the blood god's army, demons, or hallucinations on the day of the murder up to his evaluation by Dr. Donegan, where he described these influences for the first time. These inconsistent versions of what drove him to break into his parents' house where he shot his mother weakened his NGMI defense.

[¶25] Dr. Donegan's testimony also cast doubt on Mr. Steplock's claim that he was suffering from mental illness at the time of the murder. She explained that his self-described symptoms were not consistent with those of someone experiencing hallucinations or delusions. "[T]ypically, people who experience psychotic symptoms, there's not one minute they experience them and the next minute they don't. . . . That's not the course of typical hallucinations." According to Dr. Donegan, Mr. Steplock's description that he had heard certain voices in different areas of his head was also inconsistent. "Typically, with visual hallucinations, people see human content. They are not elaborate, bizarre, and they are of normal size. He . . . talked about them changing in size. So being regular size and then getting smaller and then going back to regular size." She also identified the similarity between the hallucinations he described to the characters in the video game *Warhammer*. "He talked about a 9,000-year-old demon that was short, fat, pudgy, and brown. And at least in the . . . pictures that I saw when I was looking up

9

information, Khorne [the blood god in *Warhammer*] is pictured as a short, fat, brown, pudgy kind of god." Ultimately, she concluded that Mr. Steplock "was not experiencing symptoms of mental illness that were so prominent that he was out of touch with reality, that he was unable to discern things as being wrongful, or was unable to control his behavior."

[¶26] "A claim of prejudice must be supported by more than bald assertions or speculation." *Jackson v. State*, 2019 WY 81, ¶ 28, 445 P.3d 983, 991 (Wyo. 2019) (quoting *Castellanos v. State*, 2016 WY 11, ¶ 99, 366 P.3d 1279, 1305 (Wyo. 2016)). Mr. Steplock does not argue that Dr. Donegan's testimony is erroneous or that it would be contradicted by a second psychological evaluation. Mr. Steplock provides no evidence or argument that a second evaluation would have changed the results reached by Dr. Donegan. "[A]n appellant cannot prove ineffective assistance of counsel for failure to investigate 'where [he] fails to identify the *favorable evidence or witnesses that additional investigation* would have revealed.'" *Pickering*, ¶ 66, 464 P.3d at 257 (quoting *Winters*, ¶ 46, 446 P.3d at 208). Mr. Steplock fails to establish a reasonable probability that if defense counsel had obtained a second psychological evaluation or timely knew that Dr. Donegan had not performed testing, that the outcome here would have been different. Mr. Steplock was not prejudiced.

[¶27] Although Mr. Steplock has not met his burden on prejudice, he argues that we should presume prejudice in his case. He relies on the special concurrence in *Osborne* where Justice Voigt in addressing the difficulty of proving prejudice said, "there should be some line of egregiousness that, when crossed, the presumption becomes one of ineffectiveness." *Osborne v. State*, 2012 WY 123, ¶ 31, 285 P.3d 248, 254 (Wyo. 2012) (Voigt, J., specially concurring). We have not adopted presumption of prejudice in ineffective assistance of counsel cases since *Osborne*. *See Sides*, ¶ 35, 483 P.3d at 137–38; *Leners*, ¶ 25, 486 P.3d at 1018–19; *Fairbourn*, ¶¶ 63–64, 465 P.3d at 428. We decline to do so here.

[¶28] "A failure to establish one of the two prongs dooms an ineffective assistance of counsel claim." *Richmond*, ¶ 13, 496 P.3d at 781 (quoting *Yazzie*, ¶ 20, 487 P.3d at 562). Mr. Steplock's claim of ineffective assistance of counsel fails.

### III. *Remand for Correction of Judgment and Sentence*

[¶29] The district court sentenced Mr. Steplock to life in prison for felony murder and ten to fifteen years for aggravated burglary. We have previously held that "the imposition of multiple punishments for felony murder and the underlying felony violates the Double Jeopardy Clauses of the United States and Wyoming constitutions." *Hartley v. State*, 2020 WY 40, ¶ 17, 460 P.3d 716, 721 (Wyo. 2020) (quoting *Cook v. State*, 841 P.2d 1345, 1352–53 (Wyo. 1992)); *see also Schnitker v. State*, 2017 WY 96, ¶ 21, 401 P.3d 39, 46 (Wyo. 2017). As a result, sentencing Mr. Steplock to ten to fifteen years on the underlying

felony—aggravated burglary—for first-degree felony murder was improper.  We remand to correct this error.

### *CONCLUSION*

[¶30]   The district court did not abuse its discretion when it denied Mr. Steplock's morning of trial motion to continue or in denying Mr. Steplock's Rule 21 motion for new trial.  We affirm, but remand for correction of the sentencing error.