# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 99

APRIL TERM, A.D. 2022

August 19, 2022

SHELDON SCOTT BUCKINGHAM,

Appellant
(Defendant),

v.

THE STATE OF WYOMING,

Appellee
(Plaintiff).

S-20-0278, S-22-0008

*Appeal from the District Court of Fremont County*
*The Honorable Marvin L. Tyler, Judge*

*Representing Appellant:*
Office of the State Public Defender: Diane M. Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; David E. Westling, Senior Assistant Appellate Counsel.

*Representing Appellee:*
Bridget L. Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames*, Senior Assistant Attorney General; Donovan Burton, Assistant Attorney General.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN JJ.*

* An Order Allowing Withdrawal of Counsel was entered on August 1, 2022.

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    Sheldon Scott Buckingham was convicted of numerous crimes after repeatedly confronting his soon to be ex-wife, Shai Becker, and her male friend.  On appeal, Mr. Buckingham challenges the district court's denial of his W.R.A.P. 21 motion for a new trial based on ineffective assistance of counsel.  He contends trial counsel failed to properly advise him of his right to plead not guilty by reason of mental illness (NGMI) after a psychiatrist opined he was experiencing an adverse reaction to the anti-depressant Paxil when the crimes occurred.  We affirm.

## *ISSUE*

[¶2]    Did the district court err by denying Mr. Buckingham's W.R.A.P. 21 motion for a new trial based on ineffective assistance of counsel?

## *FACTS*

[¶3]    In May 2019, Ms. Becker filed for divorce from Mr. Buckingham after approximately two years of marriage.  In June, she moved out of their home, joined a co-ed soccer league, and became friends with her teammate Chemo Carrillo, which upset Mr. Buckingham, as he did not want a divorce and believed Ms. Becker had been cheating on him with Mr. Carrillo for some time.

[¶4]    On July 16, Mr. Buckingham pulled into the parking lot of a restaurant where Ms. Becker and Mr. Carrillo were talking and started yelling at Ms. Becker.  A week later, on July 23, Mr. Buckingham ran into the Holiday Inn where Ms. Becker and Mr. Carrillo were having dinner and, by their account, began punching Mr. Carrillo in the head.  Ms. Becker and Mr. Buckingham signed their divorce decree the following day.  In an interview with police later that month, Mr. Buckingham admitted he went to the Holiday Inn to confront Ms. Becker and Mr. Carrillo because he suspected they were having an affair.  He claimed, however, that when Mr. Carrillo tried to stand up from the table, he pushed him back down and they "exchanged punches."

[¶5]    On August 9, Ms. Becker and Mr. Buckingham saw each other at a wedding rehearsal.  Ms. Becker left the rehearsal around 9:00 p.m. and went to Mr. Carrillo's home.  Mr. Buckingham left around the same time and persistently tried to contact her.  At first, he sent her text messages stating he loved her and wished she would talk to him.  When she did not respond, he bombarded her with text messages saying goodbye, expressing anger towards her, insisting she answer her phone, and suggesting he would kill himself if she did not.

[¶6]    Around 10:30 p.m., Ms. Becker and Mr. Carrillo were in his living room talking when she received a text message from Mr. Buckingham stating, "Answer the phone or

1

you both die[.]"  When she did not answer his call shortly thereafter, Mr. Buckingham kicked in the front door and entered Mr. Carrillo's home carrying an AR15.  According to Ms. Becker and Mr. Carrillo, he pointed the AR15 at them both.  He also grabbed Ms. Becker's phone and threw it across the room when he realized she was calling 911.  Ms. Becker and Mr. Carrillo tried to take the gun from Mr. Buckingham and told him to leave.  As Mr. Buckingham left, he told Mr. Carrillo, "I should have killed you."  He then fired numerous rounds into Ms. Becker's car before driving off.

[¶7]    Over the next several hours, Mr. Buckingham contacted various people, insisting he needed to talk to Ms. Becker before he killed himself.  Most notably, he called 911 and told the dispatcher he "just shot up [his] wife's car with an AR15 because she's a cheating little bitch."  He went on to state that Ms. Becker was lucky he did not kill her and Mr. Carrillo; he knew Ms. Becker was not going to answer her phone because he smashed it, the police should be at Mr. Carrillo's house because he "shot up the car instead of killing them"; he "was going to jail for a long time [for] what he did", and Ms. Becker and Mr. Carrillo were lucky they did not die.

[¶8]    When the dispatcher asked what happened that night, Mr. Buckingham succinctly explained that he knew Ms. Becker was cheating on him so he drove past Mr. Carrillo's house, "kicked in the door," "took an AR[15]," "pointed it at [Mr. Carrillo]," "grabbed [Ms. Becker's] phone [and] smashed it on the ground," walked out the door, "shot 15 shots in the car," and then left.  Mr. Buckingham turned himself in to the Riverton Police Department later that night.

[¶9]    The State charged him with eight crimes, including aggravated burglary, two counts of aggravated assault and battery, property destruction, and interference with emergency calls for his conduct on August 9; battery for hitting Mr. Carrillo on July 23 at the Holiday Inn; and two counts of stalking for his behavior toward Ms. Becker and Mr. Carrillo from July 10 to August 10.

[¶10]  Before the preliminary hearing, defense counsel moved to amend bond, asserting Mr. Buckingham had no prior criminal history or history of violence, was suffering an adverse reaction to Paxil when the charged incidents occurred, and had stopped taking the medication.  Counsel attached a report prepared by psychiatrist George S. Glass, M.D., P.A.

[¶11]  As set forth in the report, defense counsel asked Dr. Glass to evaluate Mr. Buckingham to determine whether his behavior "could have been related to or caused by" Paxil—the Selective Serotonin Reuptake Inhibitor (SSRI) antidepressant he started taking shortly before the charged incidents—and, if so, whether he posed a danger to the community now that he had stopped taking Paxil.  To form his opinion, Dr. Glass interviewed Mr. Buckingham for approximately two hours in September 2019, interviewed Mr. Buckingham's mother over the phone, reviewed notes from the counselor who

2

suggested Mr. Buckingham obtain medication, and reviewed medical records from the clinic that prescribed Paxil.

[¶12]   In Dr. Glass's opinion, Mr. Buckingham had a "paradoxical reaction" to Paxil.  His behavior on July 23 "was a response to the impulsivity, agitation, irritability, disinhibition, and psychotic decompensation which" the medication caused.  His behavior on August 9 "was also a direct result of the [Paxil] he had been taking, and the fact that he was suicidal, and attempted to kill himself in front of his wife and her boyfriend."  Mr. Buckingham "was psychotic, impulsive, out of control, [and] depressed" at the time.  Dr. Glass did not believe Mr. Buckingham posed a danger to the community, as he had stopped taking Paxil and his mood had stabilized.  The circuit court did not rule on Mr. Buckingham's motion to amend bond.

[¶13]   After the charges were bound over to the district court, Mr. Buckingham obtained a different attorney, pleaded not guilty to the charges at arraignment, and continued pursuing bond modification based on Dr. Glass's report.  The district court amended bond.

[¶14]   Concerned Mr. Buckingham intended to present a diminished capacity defense, the State moved to prohibit him from introducing any evidence about the effects of Paxil on the brain.  It noted such evidence would be inappropriate because Mr. Buckingham had not entered a NGMI plea and Wyoming does not recognize a diminished capacity defense.  Defense counsel responded that he was well aware of the law and had no intention of presenting any such defense.  The court entered an order prohibiting Mr. Buckingham from presenting any defense related to Paxil.

[¶15]   At trial, Ms. Becker and Mr. Carrillo testified to the facts summarized above.  In addition, the State introduced photographs of text messages Ms. Becker received from Mr. Buckingham, Ms. Becker's phone logs, and the damage to her car; the video recording of Mr. Buckingham's interview about the Holiday Inn incident, and the audio recording of Mr. Buckingham's 911 call.

[¶16]   Mr. Buckingham testified in his own defense.  By his account, he contacted Ms. Becker after the wedding rehearsal because he felt suicidal and wanted her to tell him she loved and cared about him.  He then happened to see Ms. Becker's car parked in front of a house he suspected belonged to Mr. Carrillo so he sent her a "false threat"—"Answer the phone or you both die"—hoping she would respond.  He kicked in the door and entered the home because he wanted Ms. Becker to know he was serious about killing himself; he also wanted her help.

[¶17]   Mr. Buckingham denied pointing his AR15 at Mr. Carrillo or Ms. Becker but admitted he grabbed her phone and threw it when he noticed she was calling 911.  He claimed he voluntarily left when he realized he put Ms. Becker in danger.  As he left, he

3

yelled, "Now I'm going to kill myself, bitch." He put the gun under his chin but could not pull the trigger so he aimed the gun at Ms. Becker's car and fired multiple shots.

[¶18] In closing argument, defense counsel did not dispute that Mr. Buckingham shot Ms. Becker's car (property destruction) and threw her phone (interference with emergency calls). He did, however, suggest the facts were muddy as to what happened at the Holiday Inn (battery) and argued he did not have the requisite intent to support the remaining charges (aggravated assault and battery, aggravated burglary, and stalking). The jury found Mr. Buckingham guilty of all the charged crimes except stalking Mr. Carrillo.

[¶19] At sentencing, Dr. Glass testified he was involved in forensic work pertaining to individuals who had a "paradoxical [] reaction to SSRI antidepressants" such as Paxil, Prozac, and Lexapro. He explained that although SSRI antidepressants generally help people, a small group became more depressed and "acutely suicidal" while on the medication. Dr. Glass stated he had reviewed records of 20 to 25 people who killed themselves while taking SSRI antidepressants. Mr. Buckingham was the first person he had encountered who had a paradoxical reaction and lived.

[¶20] The court imposed a variety of consecutive and concurrent sentences. In effect, Mr. Buckingham was sentenced to 12–20 years on the aggravated assault and battery, property destruction, stalking and misdemeanor charges and a consecutive sentence of 5–20 years on the aggravated burglary charge, the latter of which was suspended in favor of 7 years of supervised probation.

[¶21] Mr. Buckingham filed a timely notice of appeal challenging his convictions and multiple sentences (Appeal No. 20-0278). He then filed a W.R.A.P. 21 motion for a new trial, contending his second attorney (hereinafter referred to as trial counsel) failed to properly advise him of his right to enter a NGMI plea.

[¶22] At the W.R.A.P. 21 evidentiary hearing, trial counsel acknowledged some shortcomings in his knowledge of Wyoming law related to NGMI pleas and defenses and in his discussions with Mr. Buckingham about the availability of a NGMI plea and defense. However, he explained why he discounted Dr. Glass's report, why he chose the trial strategy he did, and why he did not believe a NGMI defense would have been successful.[1]

---

[1] Trial counsel explained, for example, that he spoke directly to Dr. Glass about his report and

> [t]he most impressive statement that he made to me was that Mr. Buckingham was the only person who he'd ever been able to speak to after having suffered an allergic reaction to Paxil. He further elaborated that these allergic reactions will invariably, except for in Mr. Buckingham's case, end in the suicide of the person who has had that allergic reaction to Paxil. And when I looked at what a Fremont County jury was going to do with me essentially stating that Mr. Buckingham is the luckiest person that

4

Mr. Buckingham testified he would have pleaded NGMI if he had been properly informed about the availability of such plea.

[¶23] The district court denied Mr. Buckingham's motion, concluding trial counsel's performance was not deficient. Mr. Buckingham appealed from that denial (Appeal No. 22-0008), and we consolidated his appeals.

## DISCUSSION

[¶24] The only issue Mr. Buckingham maintains on appeal is that trial counsel provided ineffective assistance by failing to properly advise him of his right to enter a NGMI plea, thus denying him the opportunity to make an informed decision whether to plead NGMI and pursue a NGMI defense.

[¶25] Mr. Buckingham had the right to effective assistance of trial counsel. U.S. Const. amend. VI; Wyo. Const., art. 1, § 10; *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). To succeed on his claim that he is entitled to a new trial because he was denied that right, Mr. Buckingham "must show both that counsel's performance was deficient, and he was prejudiced as a result." *Steplock v. State*, 2022 WY 12, ¶ 20, 502 P.3d 930, 936 (Wyo. 2022) (quoting *Neidlinger v. State*, 2021 WY 39, ¶ 53, 482 P.3d 337, 351 (Wyo. 2021)). If he does not establish either requirement, his claim fails. *Id.* ¶ 20, 502 P.3d at 937 (citing *Neidlinger*, ¶ 53, 482 P.3d at 352).

[¶26] Appeal of a district court's ruling on a W.R.A.P. 21 motion involves mixed questions of law and fact. *Id.* (citation omitted). The district court's factual findings are entitled to deference unless they are clearly erroneous, but we review de novo the court's legal conclusions on deficient performance and prejudice. *Id.* (citation omitted).

[¶27] We dispose of Mr. Buckingham's ineffective assistance claim under the prejudice prong.[2] *See id.* ¶ 22, 502 P.3d at 937. To establish prejudice, Mr. Buckingham must show that if trial counsel had properly advised him of his right to enter a NGMI plea and he had

---

Dr. Glass has ever seen regarding Paxil, . . . I decided that the trial that I was going to put on would have a far better chance in front of a jury if it was Mr. Buckingham's suicidal tendencies and not, essentially, blaming the pill.

[2] We do not decide whether trial counsel's performance was deficient. However, to the extent trial counsel acknowledged he did not know Mr. Buckingham could have entered both a not guilty plea and a NGMI plea at arraignment and did not realize that taking a prescription drug could amount to involuntary intoxication, both are well settled under Wyoming law. Wyoming Rule of Criminal Procedure 11(a)(1)(B) allows a defendant to simultaneously enter a not guilty plea and a NGMI plea, and Wyo. Stat. Ann. § 6-1-202(b) (LexisNexis 2021) provides that intoxication is not self-induced if it was caused by a substance the defendant took "pursuant to medical advice."

pursued a NGMI defense "there is a reasonable probability the outcome of the trial would have been more favorable to [him]." *See id.* He has not made that showing.

[¶28] Mr. Buckingham relies on Dr. Glass's report and sentencing testimony to support his argument that NGMI was not only a viable defense but would have resulted in a more favorable verdict. Wyo. Stat. Ann. § 7-11-304 (LexisNexis 2021) sets the standard for a NGMI defense:

> (a) A person is not responsible for criminal conduct if at the time of the criminal conduct, as a result of mental illness or deficiency, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms mental illness or deficiency mean only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality and that are not attributable primarily to self-induced intoxication as defined by W.S. 6-1-202(b).

[¶29] Dr. Glass never evaluated Mr. Buckingham to determine whether "at the time of the criminal conduct, as a result of mental illness or deficiency, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."[3] Wyo. Stat. Ann. § 7-11-304(a). He evaluated Mr. Buckingham to determine whether his alleged criminal conduct "could have been related to or caused by" Paxil and, if so, whether he posed a danger to the community if he no longer took the medication. Consequently, Dr. Glass rendered no opinion on whether Mr. Buckingham met the requirements for a NGMI defense.[4]

[¶30] Furthermore, the medical opinions Dr. Glass did render were based on limited, one-sided information about the circumstances surrounding Mr. Buckingham's alleged criminal conduct. *Cf. Snyder v. State*, 2021 WY 108, ¶¶ 32–36, 496 P.3d 1239, 1248–49 (Wyo. 2021) (concluding "the circuit court did not abuse its discretion in determining Mr. Snyder was competent to stand trial" where the doctor who opined that Mr. Snyder was competent

---

[3] We recognize that if Mr. Buckingham had entered a NGMI plea the district court would have been required to "order an examination of [him] by a designated examiner." *See* Wyo. Stat. Ann. § 7-11-304(d). But that does not relieve him of his burden to show prejudice to establish an ineffective assistance of counsel claim.
[4] At the W.R.A.P. 21 hearing, trial counsel agreed with appellate counsel's suggestion that Dr. Glass opined that Mr. Buckingham could not conform his conduct to the requirements of the law. It is plain from Dr. Glass's report, however, that he did not. Moreover, at that same hearing, trial counsel testified he did not know what Dr. Glass's trial testimony would have been on whether Mr. Buckingham could conform his conduct to the requirements of the law and stated that, in trial counsel's opinion, Mr. Buckingham "was fully capable of making rational decisions when it came to his own life and whether or not to end it. He was making rational statements about law enforcement's involvement, rational statements that he didn't want to hurt anybody[.]"

6

based her opinion on an extensive amount of information while the doctor who suggested Mr. Snyder's diagnosis could affect his decision-making ability did so based on one five-hour clinical examination). As noted above, Dr. Glass formed his opinion based on information he received from Mr. Buckingham, Mr. Buckingham's mother, and limited medical records. At sentencing, Dr. Glass acknowledged he had not reviewed any of the following: the charging documents, including the affidavit of probable cause; the police reports; the recorded interviews with Ms. Becker and Mr. Carrillo; the recorded 911 calls; the text messages Mr. Buckingham sent Ms. Becker before and after the August 9 incident; the statements Ms. Becker and Mr. Carrillo provided in support of their petitions for protection orders; and the trial testimony. He further acknowledged, with some reluctance, that those materials might change his opinion.

[¶31] Notably, Mr. Buckingham had the opportunity in the W.R.A.P. 21 proceedings to present evidence that he met the criteria for a NGMI defense, but he did not do so. That omission distinguishes this case from *Keats v. State*, 2005 WY 81, 115 P.3d 1110 (Wyo. 2005), where we concluded a petitioner for post-conviction relief established his trial counsel was ineffective for failing to properly investigate and pursue a NGMI defense. In concluding Mr. Keats established prejudice, we said:

> Keats then must also show that prejudice resulted from trial counsel's deficient performance. In this instance we find Keats has made such a showing. Because no one contended Keats did not set the fire, the only question for his defense was his intent when doing so. Trial counsel's failure to properly investigate the matter and make a NGMI plea appears to have deprived Keats of the only true defense available to him. It also appears this defense had a reasonable likelihood of success. Indeed, at the evidentiary hearing Keats provided a psychiatrist who testified Keats did not have the ability to distinguish between right and wrong or conform his behavior to the requirements of the law. By failing to investigate and therefore failing to discover the nature of Keats' bipolar disorder, counsel deprived Keats of the only credible defense available to him, thus prejudice resulted.

*Id.* ¶ 25, 115 P.3d at 1120. Unlike *Keats*, Mr. Buckingham was not deprived of the only defense available to him[5] and he presented no evidence, and there was none, showing he

<hr>

[5] Mr. Buckingham mischaracterizes counsel's trial strategy. He asserts, for example, that counsel's explanation and strategy during opening statement was to admit that Mr. Buckingham did something wrong and broke the law. That is incomplete. Counsel went on to state that Mr. Buckingham had been overcharged and the evidence did not support all the charges. Mr. Buckingham also asserts counsel admitted most charges, which is simply not true. Counsel did not dispute that Mr. Buckingham threw Ms. Becker's phone and fired shots into her car, conduct underlying two charges. Indeed, it would have been

7

did not have the ability to distinguish between right and wrong or conform his behavior to the requirements of the law. Indeed, the evidence as a whole, including Mr. Buckingham's recorded interview with a police officer about the July 23 incident, his statements to the 911 dispatcher after the August 9 incident, and his own testimony suggest he did. *See Gabbert v. State*, 2018 WY 69, ¶ 19, 420 P.3d 172, 177 (Wyo. 2018).

[¶32] For these reasons, we conclude Mr. Buckingham has not met his burden to show prejudice resulted from trial counsel's alleged deficient performance. *See Steplock*, ¶ 26, 502 P.3d at 938 ("A claim of prejudice must be supported by more than bald assertions or speculation." (citation omitted)).

[¶33] Affirmed.

---

difficult to dispute that Mr. Buckingham did so in light of what he told the 911 dispatcher later that night. *See supra* ¶¶ 7–8. Counsel disputed the remaining six charges, arguing the evidence supporting the battery charge was muddy and the State failed to prove he had the requisite intent for aggravated assault and battery, aggravated burglary, and stalking.